BROWNING-FERRIS INDUSTRIES OF ILLINOIS, INC., Petitioner-Appellant, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees.

Second District   No. 2—88—0548

Opinion filed February 3, 1989.

Lisa A. Manion, of Mohan, Alewelt & Prillaman, of Springfield (Fred C. Prillaman, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, and Wayne Wiemerslage and E. William Hutton, both of Illinois Environmental Protection Agency, both of Springfield, and Peter Thomas Smith, of Sycamore (Robert Ruiz, Solicitor General, and Michelle D. Jordan, Matthew J. Dunn, and Joseph J. Annunzio, Assistant Attorneys General, of Chicago, of counsel), for respondents.

JUSTICE McLAREN delivered the opinion of the court:

Petitioner, Browning-Ferris Industries of Illinois, Inc. (BFI), appeals from an order of respondent, the Pollution Control Board (Board), which affirmed the imposition of modifications by the Environmental Protection Agency (Agency) on BFI's closure/post-closure plan for a section of a landfill it owns and operates. The appeal is brought pursuant to section 41 of the Environmental Protection Act (the Act) (Ill. Rev. Stat. 1987, ch. 111½, par. 1041), which provides that review of Board decisions shall be afforded directly in the appel-

late court. BFI claims that the Board erred in its review of the Agency action by failing to require the Agency to carry a proper burden of proof and that the affirmance of the modifications by the Board was contrary to the manifest weight of the evidence. We disagree and affirm.

BFI, which is in the business of solid waste management and disposal, received a permit from the Agency in February 1975 to develop a solid waste disposal site in Davis Junction, Ogle County, to handle general solid wastes. Groundwater existed beneath the site in various sand layers. According to BFI's application, in order to prevent both infiltration of the fill area by this groundwater and the escape from the fill area of the liquid, known as leachate, which forms and collects at the base of the fill, an impervious cutoff wall was to be constructed to separate the fill from the sand layers. Leachate was to be collected and hauled away for proper treatment.

In October 1976 BFI applied for an amended development permit for the Davis Junction site. The application indicated that the cutoff wall details had been modified to provide a greater degree of protection against movement of liquid into or out of the fill site and proposed that the leachate, rather than being removed, should be managed through containment and natural soil attenuation (leachate renovation as the liquid passes through soil). Containment time, or the time required for leachate to move from the fill to the groundwater below, was calculated by BFI to be in the range of 164 years. The Agency's calculations, in sharp contrast to those of BFI, showed containment time to be only 55 years. BFI's estimate of containment time was dependent upon establishment of a specific gradient and maintenance of the liquid at an elevation no higher than 726 feet. If the leachate level went higher the gradient would increase and containment time would decrease. Maintaining the liquid at a 726-foot elevation meant that the leachate could be allowed to accumulate to a depth of no more than 14 feet measured from the floor of the landfill. Finally, BFI proposed modifications of the final cover of the fill in order to reduce the potential for percolation of surface water into the completed site. Provision was made for monitoring the leachate level and removal of the liquid if it rose to a critical level. A supplemental permit was issued on October 28, 1976.

The following December BFI began operating the Davis Junction site, and the principal waste materials accepted were general municipal refuse. However, pursuant to supplemental permits, BFI also accepted small amounts of hazardous wastes and liquid organic solvent wastes.

In September 1982 BFI was granted another supplemental permit which allowed the removal of 5,000 gallons of leachate per week for disposal on the dry fill at the site. BFI's application for this permit reaffirmed that the leachate was to be maintained at the mandated elevation of 726 feet, or 14-foot depth, and that any excess would be removed.

Because hazardous wastes were accepted, the Davis Junction site was registered as an "interim status" facility pursuant to the Resource Conservation and Recovery Act of 1976 (RCRA) (42 U.S.C. §6901 *et seq.* (1976)), and the appropriate Board regulations (35 Ill. Adm. Code 725.101 *et seq.* (effective May 17, 1982)). In August 1983 BFI was asked to submit an application to allow it to continue Davis Junction as a hazardous waste disposal facility and thus terminate its "interim status." However, the landfill had stopped accepting hazardous wastes in January 1983, and in January 1984 BFI filed with the Agency a closure/post-closure plan for the site.

In July the Agency approved BFI's plan but modified it by adding several mandatory requirements. BFI objected to certain of the modifications and appealed to the Board. Following a hearing on February 3, 1988, at which both BFI and the Agency presented evidence, the Board issued an opinion and order affirming the Agency's modifications to BFI's closure/post-closure plan. BFI timely filed this appeal.

■ BFI asserts initially that the Board erred in concluding that the burden of proof at Board hearings is solely on the petitioner. In its opinion the Board discussed, as a preliminary issue, the burden of proof element of permit appeal proceedings and emphatically, and correctly, found that the burden was on BFI. (Ill. Rev. Stat. 1987, ch. 111½, par. 1040(a); *Environmental Protection Agency v. Pollution Control Board* (1983), 118 Ill. App. 3d 772, 780, 455 N.E.2d 188.) The Board observed that in its post-hearing brief BFI initially acknowledged that it bore the burden of proof but subsequently attempted to shift that burden by asserting that the Agency had done nothing to determine whether BFI's plan was feasible. The Board then noted that the Agency had no obligation to perform tests at the BFI facility and stressed that "BFI is entitled to a favorable decision if, and only if, it has successfully proven that the record before the Agency indicated that BFI's Closure/Post-Closure Plan, as originally submitted and supplemented *** was sufficient to establish that the Davis Junction landfill would not cause a violation of the Act or Board regulations governing hazardous waste disposal facilities." The Board did not state, as BFI claims, that "the Agency is not required to justify its actions with regard to the plan." This language was used by the

Board to paraphrase statements made by BFI in its post-hearing brief. Nevertheless, BFI insists that the Board erred in holding that the Agency "need not attempt to meet the applicant's case." Our reading of the Board's opinion, however, nowhere reveals any such holding.

The Board did not even reach the question of the burden upon the Agency at Board hearings, much less state that the Agency need do nothing in order to prevail against a petitioner's showing. If such were the case, the Agency could never lose! BFI agrees with the Board that BFI had the initial burden of establishing a *prima facie* case. A close reading of its opinion reveals that the Board concluded, not that the Agency was relieved of all burden, as BFI insists, but that BFI had made neither the requisite *prima facie* showing nor established the ultimate proof of its claims and that the Agency was not obligated to carry the burden for BFI. Consequently, the Board stopped short of any discussion of what the Agency's burden might have been if BFI had successfully made its initial case. We note also in this regard that, as will be shown, the evidence produced by BFI did not go completely unchallenged, as BFI implies. The Board did not err in its application of the law controlling the burden of proof at Board hearings.

■ BFI next challenges the Board's findings regarding the modifications imposed by the Agency. Upon review of Board actions it is the task of the appellate court to evaluate the evidence in order to determine whether the findings and conclusions of the Board were against the manifest weight of the evidence. (*Environmental Protection Agency v. Pollution Control Board* (1986), 115 Ill. 2d 65, 70, 503 N.E.2d 343.) The record of the instant case reflects ample support for the Board's findings.

Permits are granted by the Agency pursuant to section 39(a) of the Act, which sets forth the requirements for securing a permit as follows:

> "When the Board has by regulation required a permit for [a facility such as Davis Junction] it shall be the duty of the Agency to issue such a permit upon proof by the applicant that the facility *** will not cause a violation of this Act or of regulations hereunder." (Ill. Rev. Stat. 1987, ch. 111½, par. 1039(a).)

Section 39(a) also provides for modifications to permits:

> "In granting permits the Agency may impose such conditions as may be necessary to accomplish the purposes of this Act, and as are not inconsistent with the regulations promulgated

by the Board hereunder." (Ill. Rev. Stat. 1987, ch. 111½, par. 1039(a).)

Accordingly, keeping in mind the burden of proof discussed above, in order to prevail on its claim BFI needed to show that the modifications imposed by the Agency were not necessary to accomplish the purposes of the Act, or, stated alternatively, BFI had to establish that its plan would not result in any future violation of the Act and the modifications, therefore, were arbitrary and unnecessary. (*Alton Packaging Corp. v. Pollution Control Board* (1987), 162 Ill. App. 3d 731, 736-37, 516 N.E.2d 275; *Environmental Protection Agency*, 118 Ill. App. 3d at 780.) The Board found that BFI did not produce sufficient evidence to make the necessary showings in regard to any of the three modifications which constitute the subject matter of this appeal.

■ BFI first attacks modification paragraph 4, which required BFI to maintain a maximum leachate depth of one foot (elevation 713 feet), rather than the 14-foot depth (elevation 726 feet) originally proposed in its plan. In order to comply with paragraph 4, BFI would have to pump down the leachate already in the fill, an admittedly costly procedure.

BFI agrees with what the Board calls a "narrative standard" for review of the evidence and determination of whether BFI sufficiently showed that the 14-foot leachate depth would not result in violation of the Act. This standard was arrived at after the Board examined and summarized the relevant statutory and regulatory provisions. According to BFI, the standard requires its closure/post-closure plan to "minimize the risk to human health and the environment from the escape of hazardous waste and leachate into the ground or surface waters, and prevent excess accumulation of leachate which would foster the migration of hazardous waste constituents into groundwater in such quantities or concentration that would cause water pollution." BFI claims that the evidence it presented showed that its plan would meet the standard. We disagree.

BFI focuses on its 1976 and 1982 supplemental development permits along with the calculations and drawings submitted in support of the 1976 permit. Petitioner argues that the Agency's grant of those permits, which allowed the 14-foot leachate head, was evidence that 14 feet of leachate is environmentally safe. We note initially that BFI asserts that the Board erroneously characterized its reliance on the past permits as an estoppel argument. We need not address this matter, however, because even when the permits are considered evidence on the leachate level issue, they are not persuasive.

Both of the supplemental permits specify that they merely modify

the permit initially granted to BFI in 1975. The emphasis of BFI's leachate management system shifted from removal to containment, which necessitated increased depths of the liquid, when the 1976 permit was granted. The application for the 1976 permit reflects that the soil under the fill was studied to determine its permeability and its ability to renovate the leachate. Containment time was calculated on the basis of these studies. The 1982 permit dealt only with implementation of a leachate collection system, and leachate levels were mentioned in the application only in relation to the proposed collection procedure. No further soil tests, studies, or analyses were presented. Consequently, the basic technological evidence of the ability of the landfill to contain and attenuate the leachate consists of data developed a minimum of approximately eight years before the 1984 closure/post-closure plan was submitted and more than 11 years prior to the Board hearing.

During the span of time between 1975-76, when the fill was being developed, and 1984, when BFI sought to close the subject section of the fill, significant changes were occurring in the understanding of the dangers inherent in hazardous wastes. In 1981 the Illinois General Assembly responded to this understanding by including the following language in an amendment to the legislative declaration regarding the land pollution and refuse disposal provisions of the Act:

"The General Assembly finds:
* * *

(4) that hazardous waste presents, in addition to the problems associated with non-hazardous waste, special dangers to health and requires a greater degree of regulation than does non-hazardous waste * * *." Ill. Rev. Stat. 1987, ch. 111½, par. 1020(a)(4).

The awareness of hazardous waste disposal problems, however, was not reflected in the regulations which authorized the permits granted to BFI in 1975, 1976 and 1982. While the pertinent regulations were not made part of the record on appeal, we may properly take judicial notice of them. (*Hofmeister v. Department of Registration & Education ex rel. Galvin* (1978), 62 Ill. App. 3d 777, 780, 379 N.E.2d 383; *Sye v. Wood Dale Fire Protection District No. 1* (1976), 43 Ill. App. 3d 48, 50, 356 N.E.2d 938.) BFI's permits were based on the Board's solid waste regulations which were adopted in 1973 (filed with the Secretary of State July 27, 1973, codified at 7 Ill. Reg. 13636, recodified at 35 Ill. Adm. Code 807.101 *et seq.* (1985)) and which did not distinguish between landfills accepting municipal refuse and those accepting hazardous waste. By the time BFI sought a per-

mit to close Davis Junction, this situation had changed. The Board stated in its opinion, and BFI does not dispute, that "BFI's first permit which contained conditions implementing the RCRA [Federal] hazardous waste regulatory scheme is the permit now at issue."

Viewed in the context just described, it is evident that the permits and documentation on which BFI relies show only that, under the state of scientific and technological knowledge prevailing in 1976, a 14-foot depth of leachate at the Davis Junction site was not, in the Agency's view, likely to result in a violation of the Act. Considering what had been learned in eight years about hazardous wastes and their effect on the environment, the permits do little to show that, as of 1984, 14 feet of leachate in a site which had accepted such wastes and was sought to be closed, thus making access to the liquid significantly more difficult and costly, would not result in a violation of the Act. BFI's previous permits are of little persuasive value on the leachate level issue.

BFI's reliance on *Central Illinois Public Service Co. v. Pollution Control Board* (1988), 165 Ill. App. 3d 354, 518 N.E.2d 1354, for the proposition that its past permits are evidence of the reasonableness of its closure/post-closure plan is misplaced. In *Central Illinois* the Agency issued a permit with a condition that had not been imposed on several prior permits. The court held that the Agency was bound by its prior policy, as reflected in the past permits, to issue a new permit without the added condition. This holding, however, was reached "in view of the lack of any changed circumstances which would support the Agency's" decision to change its policy. Here, in contrast to *Central Illinois*, since BFI's earlier permits were issued the dangers of hazardous wastes have been more fully recognized, and specific waste disposal regulations have been established. In our view these facts constitute a change from the circumstances which prevailed when BFI received the prior permits. *Central Illinois* indicates that under these circumstances the Agency is not bound by its prior actions.

BFI also cites as evidence a 1982 groundwater monitoring report which, as admitted by the Agency, shows no adverse impact on the groundwater underlying the site. This evidence is of no more help than the permits and documentation discussed above. While the estimates of the time involved varied from 55 years to 164 years, the parties do not dispute that at some time the leachate will seep through the bottom of the fill and reach the groundwater. The question is whether maintenance of a 14-foot depth of leachate will have a deleterious effect on the groundwater in the future and, if so, whether the

effect will constitute a violation of the Act. The 1982 groundwater monitoring report provides no answers to these questions.

Descriptions of the landfill construction and soil characteristics, and the specifications for the final cover of the fill, were offered by BFI as evidence of the site's potential for containment and low permeability. This evidence suffers from the same weakness as the groundwater monitoring report in that it tells nothing about what the leachate will do or where it will be when it eventually escapes the fill and enters the broader environment. Moreover, inconsistent and/or conflicting testimony was given regarding the current movement of liquid through the landfill. As the Board correctly noted, water entering the fill must either exit the fill or increase the leachate head, and BFI indicated that the leachate head had not exceeded the originally permitted 14-foot depth. BFI's calculations of the amount infiltrating the fill through the cover varied from time to time and did not always account for all the water entering the cover. The Agency evidence regarding infiltration conflicted significantly with one BFI estimate but paralleled another. The Board's calculations show that, even when the figures most favorable to BFI were used, a significant amount of leachate migration out of the fill was occurring. However, no evidence was produced to show the composition of the leachate, how it was escaping, where it was going, or what impact it was having. On this record the Board was properly "unwilling to conclude as a matter of law that over 900,000 gallons of leachate per year from a hazardous waste landfill cannot cause pollution." BFI's evidence regarding the soundness of its landfill did little to alleviate the Board's concerns regarding potential pollution or, more specifically, to show that a 14-foot leachate level would not contribute to any future pollution and thus would not at some time result in a violation of the Act.

BFI finally claims to have presented undisputed testimony and evidence to support its position regarding the post-closure leachate level in the landfill. Petitioner cites to the groundwater monitoring report mentioned above and the testimony of an expert, based on that report, that a 14-foot leachate head would not violate the regulations regarding post-closure escape of leachate to the groundwater. As we discussed earlier, in light of the evidence from both parties that at some point in the distant future the leachate will naturally seep into the groundwater, we find little value in a groundwater report prepared in 1982 on a landfill which began operating only in late 1976. We are also unimpressed by the groundwater report since evidence indicated, as shown above, that leachate may presently be leaking out of the fill.

BFI's argument that its evidence regarding compliance with the closure standards is undisputed misapprehends the nature of that evidence. While it is true that the Agency previously allowed the higher leachate level and that no contamination showed up in the groundwater report, this information, as we have already discussed, was not relevant and did not show that a 14-foot depth of the liquid would not have any adverse effects on the environment or human welfare. Consequently, it is of little significance that the evidence was not disputed.

BFI raises questions concerning the ground for the Agency decision to require it to pump down the landfill. In this regard we find the record somewhat sketchy and emphatically stress the need for caution on the part of the Agency to ensure a sound basis for the imposition of conditions or modifications on permits. However, when an Agency permit modification is appealed to the Board, the Act places the burden of proof at the Board hearing squarely on the petitioner. (Ill. Rev. Stat. 1987, ch. 111½, par. 1040(a).) That burden is to show that the plan, as proposed by the applicant, will not result in the violation of the Act or that the modification is not necessary. Here, BFI pointed out the historical sufficiency of its landfill but failed to deal with the fact that Davis Junction has accepted hazardous waste and thus calls for a greater degree of caution and assurance of its future safety. BFI's focus on the containment capability of the fill and the current absence of groundwater contamination was undercut by its failure to resolve questions raised by the ongoing escape of leachate from the fill, as revealed by its own evidence. In our view BFI did not show that the leachate level aspect of its post-closure plan would not result in a violation of the Act or that the modification imposed by the Agency was not necessary. In light of BFI's failure to establish a *prima facie* case, the Board's affirmance of the modification imposed by the Agency was not contrary to the manifest weight of the evidence.

The next modification challenged by BFI is contained in paragraph 5(j), which requires quarterly testing of groundwater under the fill for the presence of three organic solvent wastes: methylene chloride; 1,1,1 trichloroethane; and trichloroethylene. Specific testing for these solvents had not been required under a previously approved groundwater monitoring program. BFI asserts that the record does not indicate that these compounds were ever disposed of in the pertinent section of the Davis Junction landfill. However, BFI presents nothing to affirmatively show that they were not accepted at the fill despite evidence, cited by the Agency, that all three were repeatedly

permitted for disposal at the site in various quantities and concentrations. BFI submitted no evidence to show either the exact chemical composition of the leachate or the makeup of the wastes placed in the fill which might allow a determination that the solvents were not present. On these facts the Board accurately stated that the record indicates that the solvents "are likely resident in the landfill."

BFI also claims, and the Agency does not dispute, that there is no direct or explicit basis in the regulations for adding the new testing requirements to BFI's groundwater monitoring program. Rather, the Agency relies on its authority pursuant to section 39(a) of the Act to impose conditions necessary to accomplish the purposes of the Act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1039(a).) As noted above in relation to the purposes of the Act, BFI acknowledges an obligation on its part to minimize the risk to human health and the environment from the escape of hazardous waste and leachate into the groundwater. In light of this standard we do not perceive any abuse of statutory authority by the Agency.

The record reveals in an exhibit labeled "IEPA Solvent Waste Disposal Inventory," dated June 1, 1982, that landfilling of organic solvent wastes had only recently come under scrutiny because of evidence of widespread contamination of groundwater by such wastes. Although BFI plays down the significance of the information, this same inventory, as well as a letter from BFI to the Agency, acknowledged recent evidence that organic solvent wastes might increase the permeability of the soils in which they were contained. The record also shows that BFI was already required to conduct certain tests which would detect the presence of the solvents but, according to one of BFI's experts, these tests were more general in nature than the specific tests sought by the Agency and probably could not detect the solvents at levels as low as those that could be detected by the specific testing procedures.

From this record we conclude that the solvents (1) probably are in the landfill, (2) pose at the very least a recognizable risk of groundwater contamination, and (3) might not be detectable by the tests currently used by BFI. BFI's argument that the amount of methylene chloride; 1,1,1 trichloroethane; and trichloroethylene, if any, that was accepted at the landfill is too minute to be a threat to people or their environment is not persuasive. While evidence was presented to show that the total amount of all solvent waste was small compared to the total volume of all wastes disposed of at Davis Junction, as we noted above, no evidence was given to show that the three questionable compounds were not dumped at all or that they made up only a negli-

gible portion of the total solvent waste. Furthermore, in the absence of evidence from BFI to the contrary, it cannot be concluded that the presence of the solvents in the groundwater would pose no threat to the environment or human health merely because they are present in only small amounts. We do not believe BFI made an adequate showing that the more specific testing imposed by modification paragraph 5(j) is not necessary to minimize the risk to human health and the environment from the escape of leachate into the groundwater. Hence, the Board's order affirming the modification was not contrary to the manifest weight of the evidence.

■ The final issue raised by BFI is prompted by an unnumbered paragraph which appears after all the numbered modifications in the Agency's modification letter and evidently applies to the entire closure/post-closure plan. The paragraph states:

> "If the Agency determines that implementation of the Closure and Post Closure Plan fails to satisfy requirements of 35 IAC 725.211, the Agency reserves the right to amend this Closure and Post Closure Plan."

BFI argues that the Agency lacks authority to amend a closure/post-closure plan once it has been approved and insists that the Agency's reservation of a unilateral right to amend violates its due process rights.

The Board approved the provision attacked by BFI on the basis of a regulation which permits the Agency to modify a post-closure plan during or at the end of the post-closure care period, subject to a panoply of due process safeguards. (35 Ill. Adm. Code 725.218(f)(2) (1985).) With reference to this regulation, we have determined the Board properly found that the Agency was not asserting any extrastatutory authority which did not meet the requirements of due process.

The challenged paragraph of the Agency's modification letter requires BFI to implement its plan so as to satisfy the closure performance standard for hazardous waste management facilities. This standard must be met by a closure plan as initially submitted to the Agency and is set forth in the Code as follows:

> "The [landfill] owner or operator must close his facility in a manner that:
>
> \*\*\*
>
> (b) Controls, minimizes or eliminates, to the extent necessary to protect human health and the environment, post-closure escape of hazardous waste, hazardous waste constituents, leachate, contaminated rainfall or waste decomposition products to the ground or surface waters or to the atmosphere."

(35 Ill. Adm. Code 725.211 (1985).)

The regulation relied on by the Board provides that a post-closure plan "may be modified during the post-closure care period or at the end of the post-closure care period." (35 Ill. Adm. Code 725.218(f) (1985).) Hence, the regulation becomes applicable after the plan has received initial approval and implementation has begun. Modification at this point can be accomplished as follows:

"The Director may tentatively decide to modify the post-closure plan if he deems it necessary to prevent threats to human health and the environment. He may propose to extend or reduce the post-closure care period based on cause or alter the requirements of the post-closure care period based on cause." (35 Ill. Adm. Code 725.218(f)(2) (1985).)

As can be seen from its language, the latter regulation allows modification in order to achieve and maintain essentially the same standard as that required by section 725.211 prior to approval.

Since it merely sets forth a standard, section 725.211 does not contain within itself any due process safeguards for the plan review process. However, those protections are provided prior to approval of a plan by other sections of the Code. (35 Ill. Adm. Code 725.212(d) (1985).) When the Agency seeks modification after the period of post-closure care has begun, section 725.218(f)(2) requires that full notice and opportunity to be heard be extended to an owner/operator of a hazardous waste landfill prior to a final decision regarding such modification. Section 725.218(g) provides a right to appeal a post-approval Agency modification. 35 Ill. Adm. Code 725.218(g) (1985).

It is obvious from the regulatory scheme as a whole that the Agency may modify an applicant's plan, either before or after approval, in order to secure and maintain the Board's established performance standard. It is also apparent that an applicant must be afforded due process when modifications are imposed, and it does not matter whether modification occurs during the initial approval process or after implementation of the post-closure plan has begun. The Agency proviso challenged here must be viewed in light of this scheme.

While the Agency's reservation of rights clause, on its face, contains no due process guarantees, it does refer to section 725.211 which, as described, is a standard to be enforced, but only in an atmosphere which protects the petitioner's due process rights. This reference is persuasive that the Agency did not intend that reservation of its own rights should in any way infringe on BFI's right to due process. Our observation is reinforced by the clear intent of section

725.218(f)(2) to ensure a petitioner's due process rights during a post-closure modification procedure by the Agency. We conclude that the Agency has not sought a method of taking unilateral action against BFI and that the reservation of rights clause sent by the Agency to BFI includes, by implication, the same procedural safeguards as are provided to an owner or operator during the post-closure care period by section 725.218(f)(2).

For the foregoing reasons, we affirm the order of the PCB.

Affirmed.

REINHARD and WOODWARD, JJ., concur.