JOHN SEXTON CONTRACTORS COMPANY, Petitioner-Appellant, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees.

First District (4th Division) No. 1—89—1393

Opinion filed June 29, 1990.

416

Petition for review of order of Pollution Control Board.

Mohan, Alewelt, Prillaman & Adami, of Springfield (Fred C. Prillaman and Lisa A. Manion, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Michelle D. Jordan, Matthew J. Dunn, Joseph J. Annunzio, and Arleen C. Anderson, Assistant Attorneys General, of Chicago, of counsel), for respondents.

JUSTICE JIGANTI delivered the opinion of the court:

The petitioner, John Sexton Contractors Company (Sexton), appeals from an order of the respondent, the Pollution Control Board (Board), which affirmed the imposition of special conditions by the Environmental Protection Agency (Agency) on Sexton's closure/post-closure care plan for its landfill in Lansing, Illinois. This appeal is brought pursuant to section 41 of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1987, ch. 111½, par. 1041), and Supreme Court Rule 335 (107 Ill. 2d R. 335), which provide that review of a Board decision shall be afforded directly in the appellate court. Sexton contends that the Board erred in concluding that the closure/post-closure care plan constituted a permit application to which the Agency was authorized to attach conditions. Sexton further contends that the Board's decision to affirm the four special conditions which are contested in this appeal was against the manifest weight of the evidence. Also, Sexton maintains that two of the special conditions were premised upon draft guidelines which had not been promulgated or adopted in accordance with Board regulations.

Sexton operates a solid waste landfill on 60 acres of land near Lansing, Illinois. On June 5, 1982, the Agency issued a permit to Sexton for the development and operation of a 20-acre solid waste disposal site designed to accept commercial, industrial and residential solid wastes. On March 18, 1983, the Agency issued a supplemental permit allowing Sexton to operate the landfill on the adjacent 40 acres of land. In 1975 and 1976, Sexton was issued supplemental permits allowing for the disposal of sludge and liquid wastes containing heavy metals, polyvinyl acetate, methylene chloride, tricresyl phosphate, triethanolamine and waste-cutting oils (hereinafter referred to as special wastes). Throughout the course of this litigation, Sexton has denied that these special wastes were ever accepted into the landfill.

In 1983, the Environmental Protection Act was amended to add section 21.1, which requires all owners and operators of sanitary landfills to post a bond or other financial document with the Agency to assure that sufficient funds will be available upon closure of the landfill to properly close and monitor it for a specified length of time. (Ill. Rev. Stat. 1987, ch. 111½, par. 1021.1.) Section 21.1 authorizes the Board to adopt regulations to promote the purposes of this section and authorizes the Agency to "approve or disapprove any performance bond or other security posted" and to "establish such procedures as it may deem necessary for the purpose of implementing and executing its responsibilities under this Section." (Ill. Rev. Stat. 1987, ch.

111½, pars. 1021.1(b), (e), (f).) The Agency's disapproval of a performance bond or other security may be contested in a permit denial appeal. Ill. Rev. Stat. 1987, ch. 111½, par. 1021.1(e).

In 1985, the Board adopted a final order implementing the requirements of section 21.1 of the Act in a proceeding entitled *In The Matter Of: Financial Assurance For Closure And Post-Closure Care of Waste Disposal Sites (Economic Impact Of Temporary Regulations And Adoption Of Final Regulations)* (Board Rule 84—22C (November 21, 1985)), and issued regulations (35 Ill. Adm. Code §§807.501 to 807.666 (1986 Supp.)). Essentially, the regulations require a landfill operator to prepare a closure/post-closure care plan which would serve as a basis for cost estimates to implement the financial assurance requirements of section 21.1 of the Act. Section 807.501, which states the purpose, scope and applicability of the Board regulations, provides that the closure/post-closure care plans "will become permit conditions" and will "form the basis of the cost estimates and financial assurance required *** for disposal sites." (35 Ill. Adm. Code §§807.501(b), (c) (1986 Supp.).) Section 807.502 states the closure performance standard, providing that: "an operator of a waste management site shall close the site in a manner which: (a) [m]inimizes the need for further maintenance; and (b) [c]ontrols, minimizes or eliminates post-closure release of waste, waste constituents, leachate, contaminated rainfall, or waste decomposition products to the groundwater or surface waters or to the atmosphere to the extent necessary to prevent threats to human health or the environment." (35 Ill. Adm. Code §807.502 (1986 Supp.).) Sections 807.503(a) and (d) state that "[a]n operator of a waste management site shall have prepared a written closure plan which shall be a condition of the site permit" and which "shall be included in the permit application." (35 Ill. Adm. Code §§807.503(a), (d) (1986 Supp.).) Section 807.503 also provides that the closure/post-closure care plan "shall be a condition of the site permit." (35 Ill. Adm. Code §807.503(a) (1986 Supp.).) Section 807.504 defines the submission of any modification of a closure plan as a "permit application." 35 Ill. Adm. Code §807.504 (1986 Supp.).

In accordance with section 21.1 of the Act and the Board regulations, Sexton submitted a revised closure/post-closure (CPC) care plan to the Agency on July 13, 1988. On July 26, 1988, the Agency approved Sexton's CPC care plan, but imposed 34 special conditions on the plan. Sexton appealed to the Board from special conditions 4, 6, 17, 19(b) and 20. Special condition 20 is not a subject of this appeal. Special condition 4 concerned gas control at the landfill following its closure. Sexton's CPC care plan stated that gas control would be ef-

fected through a passive gas-flaring system and outlined the number, locations and types of passive gas flares that it had installed and intended to install at the site. The plan further stated that "[u]pon closure, the gas may be used for electricity generation." The Agency's special condition 4 stated:

"The information developed for Special Condition No. 3[1] shall be used to determine a closure and post-closure time frame for 'Gas Control' activities. This gas control facility should be considered separate from the landfill activity, and the subject of a partial closure plan. A revised closure/post-closure care plan for the landfill with a separate closure/post closure care plan for gas control shall be sent to this Agency within ninety (90) days on [sic] this permit."

Special condition 6 involved leachate management. Leachate is the liquid which forms and collects at the base of the landfill. Sexton's CPC care plan indicated that its passive gas control system may be utilized in the future for leachate extraction and further indicated that it would monitor the site for leachate "weeps," "seeps" and "pop outs" through the final cover. It would also monitor the groundwater for contamination. Special condition 6 provided as follows:

"The applicant [Sexton] shall propose a leachate management program for this site that will define the amount and type of leachate generated, how the leachate elevation will be stabilized, when and how the leachate will be attenuated."

Special condition 17 concerned a groundwater-monitoring system. At the time Sexton submitted its CPC care plan, it had in place a comprehensive groundwater-monitoring program which the Agency approved in 1984. Special condition 17 provided as follows:

"The groundwater monitoring program for this site is subject to the following modifications:

a. The existing monitor wells *** shall be sampled and tested for initial water quality parameters *** for four (4) quarters.

b. Propose a revised groundwater monitoring program, based on draft Groundwater Monitoring Network design guidelines. The proposal shall include at least one (1) deep upgradient monitor well capable of determining groundwater quality flowing onto and unaffected by the landfill, and new downgradient wells that will help assess the current contribution of the existing landfill on groundwater quality and determine if a release

---

[1]Special condition 3 required the operator to demonstrate how the facility would be closed in a manner which complied with the purposes of the Act.

to groundwater is occurring. This shall be by a supplemental permit request within 60 days of the date of this permit.

c. Determine the gradients and groundwater flow directions through the potential leachate migration pathways and identify the potentially impacted water resources (i.e. surface water groundwater aquifers). This can be done by determining the piezometric and hydraulic characteristics of the potential leachate migration pathways."

Special condition 19(b) established the criteria to be used in determining whether the groundwater near the landfill is being impacted by the facility. Sexton's CPC care plan proposed that groundwater quality would be measured against groundwater parameters reported from previous quarterly reports. Where "distinctive differences" occur, a report would be prepared and further analytical evaluations undertaken to establish the nature of the data variability. Special condition 19(b) stated:

"If any parameter exceeds, over twice the background quality, groundwater contamination shall be suspected and within 30 days of the report due date for the quarter another sample shall be obtained from the suspect well and analyzed for all background parameters."

A Board hearing was held on November 3, 1988, at which Sexton presented three witnesses: James D. Schoenhard, the Agency permit reviewer who imposed the special conditions; Richard W. Eldredge, the engineer who prepared Sexton's CPC care plan; and Joseph R. Benedict, Jr., Sexton's director of regulatory affairs. The Agency presented no witnesses.

James D. Schoenhard testified that he reviewed Sexton's CPC care plan and inserted the special conditions. He stated that he inserted special condition 4, which required a separate CPC care plan for a "gas control facility," because Sexton mentioned that at some time in the future landfill gas may be used for electricity generation. This indicated to him that both the volume and pressure of the landfill gas must have been significant. Schoenhard testified that Sexton's plan failed to indicate how long the landfill would continue to generate gas, or explain how and when any of the existing or proposed gas vents would be closed. According to Schoenhard, it was possible for Sexton to calculate the approximate time that gas would be generated in enough volume to cause a problem to human health and the environment. If Sexton were to close its gas control system at a time when gas was still being generated in the landfill, the gas could build up enough pressure to blow a hole in the containment.

Schoenhard testified that special condition 6, requiring Sexton to propose a new leachate management program, was necessary "[o]nly to the extent that we [the Agency] have reason to believe that there are many gallons of liquid in the landfill that were placed in the landfill by permit." Schoenhard stated that Sexton's proposal to use the passive gas-flaring system to extract leachate was not necessarily denied, but that the Agency needed more information regarding the amount and type of leachate generated at the landfill. He further testified that special condition 17, which required Sexton to propose a new groundwater-monitoring system, was based at least in part on the Agency's belief that Sexton accepted the special wastes for which it had received permits. According to Schoenhard, certain of the special wastes had the ability to permeate the clay liner of the landfill and contaminate the groundwater. At one point in the hearing, the following exchange occurred:

"Q. [Counsel for the Agency]: Mr. Schoenhard, does your concern with the [groundwater] adjacent to or beneath the Sexton Lansing site have anything to do with the liquids that may have gone into the landfill?

A. [Schoenhard]: Oh, sure. It has been determined by a lot of experimentation that these particular hydrocarbon materials that have lower dielectric constant in water will cause a collapse of clay and permit laminar flow which effectively allows liquid to go through clay a hundred to a thousand times faster than the water would.

\* \* \*

Q. So what you have before you [was] information that indicated Sexton did have permission to take those materials [the special wastes] to the landfill?

A. Yes.

Q. And that's what the condition was based on, that being both the leachate management control condition and condition 17, being the groundwater monitoring condition?

A. Yes."

Schoenhard testified that special condition 17(a), which required additional background groundwater-quality testing, was made necessary by fluctuations in the ongoing quarterly results as well as by the fact that the special wastes were in the landfill. He also stated that the Board had enacted new rules and regulations since the Agency had approved Sexton's comprehensive groundwater-monitoring program in 1984, but did not specify any of the new rules or regulations. Schoenhard acknowledged that the groundwater-monitoring network

design guidelines referred to in special condition 17 were in draft form and had not been adopted by the Board.

With respect to special condition 19(b), the "over twice the background" standard which would trigger the need for further sampling, Schoenhard stated that there was no Board rule or regulation for determining when contamination at a nonhazardous waste site poses a threat to human health or the environment. Rather, the Agency permit reviewer makes this determination on a case-by-case basis. Schoenhard explained that where the number one represents the background quality, any number higher than one could conceivably relate to contamination. He chose the number two, representing twice the background quality, as the triggering mechanism because it was the next whole number. In Schoenhard's opinion, Sexton's triggering mechanism, *i.e.*, "distinctive differences" between the groundwater parameters of samples taken and those reported from previous quarterly reports, was undefined and subjective.

Richard Eldredge testified that he prepared Sexton's CPC care plan. In his opinion, the gas control system proposed by Sexton was adequate to protect the health, safety and welfare of the area, rendering special condition 4 unnecessary. He stated that the gas flares at the site were 10 to 15 feet deep, which is the typical depth for relieving gas at landfills. Eldredge further testified that Sexton's proposal to use the gas control system to extract leachate is effective and common in the industry, rendering special condition 6 unnecessary. He disagreed with Schoenhard's opinion that certain wastes could attack the clay liner under the conditions which existed at Sexton's landfill.

Eldredge opined that special condition 17 was also unnecessary. He stated that the present list of parameters for which Sexton tests was adequate and that there was no reason to believe that there were chemicals or constituents in the landfill which would not be detected by the presently permitted monitoring system. From his review of groundwater-monitoring results from the two deep downgradient wells, he concluded that the site has had no impact on the groundwater. There was therefore no need to install an upgradient deep well, although Sexton may wish to do so if the downgradient deep wells ever showed signs of contamination. Furthermore, Eldredge stated that Sexton has already provided the Agency with information regarding gradients and groundwater flow directions.

In Eldredge's opinion, there are no potential leachate migration pathways at the site because it was established in a clay environ and those areas where such pathways may have existed had been intercepted by a recompacted liner.

Joseph R. Benedict, Jr., Sexton's director of regulatory affairs, testified that he had reviewed the permits allowing Sexton to receive the special wastes and that, with the exception of a single load of sludge, none of the special wastes was ever received by the landfill. Benedict stated that his conclusion that the special wastes were not taken into the landfill was based on his review of "every record, permit file, billing record, site logs—a site log is simply a site diary, cash receipts, notice of cash receipts, bills, and correspondence between members of the corporation of that time period and the people in question."

Benedict testified that in order to comply with special condition 4, assuming the Agency would find Sexton's passive gas collection and flaring system to be inadequate, it would cost Sexton $500,000 to construct a positive extraction system. The annual maintenance costs for the system would be $66,000. With respect to special condition 6, it would cost Sexton $800,000 to retrofit a leachate collection system to the landfill and an additional $200,000 per year for maintenance and removal. Benedict stated that Sexton did not conduct any studies to determine whether there was a leachate problem at the site, but believed it was unnecessary because Sexton did not receive any of the special wastes which formed the basis of the Agency's imposition of special condition 6. Benedict testified that it would cost Sexton approximately $1 million to comply with the groundwater-monitoring requirements of special condition 17. He stated that such costs were unnecessary and also unfair because the landfill is nearly closed and there would be no way to finance the requirements imposed by the special conditions.

The Board affirmed the Agency's imposition of the special conditions, and Sexton has appealed. The pertinent findings of the Board will be related in our discussion of the issues raised by Sexton.

Sexton first contends that the Board erred in construing Sexton's CPC care plan as a permit application to which the Agency could attach conditions. Sexton argues that treatment of the plan as a permit application has the effect of allowing the Agency to reopen the substantive terms of the permit and update those terms to meet the Agency's own more stringent closure/post-closure care requirements. By judging the plan according to draft guidelines, Sexton argues, the Agency is able to devise an "end-run" around the Board's regulations and force landfill operators to redesign their landfills according to the Agency's latest concept of technical propriety. According to Sexton, section 21.1 of the Act makes no reference to any such permit modification system and specifically limits the Agency's options to approval

or disapproval of the proposed financial assurances.

As stated earlier, section 21.1 of the Act requires owners and operators of landfills such as Sexton to post a bond or other financial document with the Agency to assure that sufficient funds will be available to properly close the landfill and monitor it after closure. (Ill. Rev. Stat. 1987, ch. 111½, par. 1021.1.) Section 21.1 specifically authorizes the Board to adopt regulations to implement these financial requirements. (Ill. Rev. Stat. 1987, ch. 111½, par. 1021.1.) Pursuant to this authorization, the Board adopted regulations requiring landfills to prepare a closure/post-closure care plan which would serve as a basis for cost estimates which would be used to implement the financial requirements of the Act. (35 Ill. Adm. Code §§807.501 to 807.666 (1986 Supp.).) The regulations state that the CPC care plan will become a condition of the site permit (35 Ill. Adm. Code §807.503(a) (1986 Supp.)) and require that the closure plan be included in the permit application (35 Ill. Adm. Code §807.503(d) (1986 Supp.)). Any submitted modification of the plan is deemed a permit application. 35 Ill. Adm. Code §807.504 (1986 Supp.).

In its opinion affirming the Agency's imposition of the special conditions, the Board interpreted these regulations as stating clearly that "the initial submission of a closure plan, or the submission of amendments to that plan, constitute a permit application." The Board determined that pursuant to the regulations, the Agency had the authority to impose conditions upon the permit application to ensure compliance with the Act.

█ It is well established that the interpretation given by an administrative agency to its own rules and regulations is entitled to respectful consideration and will not be overruled unless plainly erroneous. (*Heifner v. Board of Education of Morris Community High School District No. 101* (1975), 32 Ill. App. 3d 83, 87, 335 N.E.2d 600.) In interpreting the meaning of Agency regulations, the courts apply the same rules of construction that are used in construing statutes. (*Heifner*, 32 Ill. App. 3d 83, 335 N.E.2d 600.) Therefore, in determining the intent of the drafters in adopting a regulation, a court may consider the language used, the reason and necessity for the regulation, the evil sought to be remedied and the purpose to be achieved. *Stewart v. Industrial Comm'n* (1987), 115 Ill. 2d 337, 341, 504 N.E.2d 84.

█ Here, regulations were enacted to implement the Act's requirement that landfill owners and operators provide financial assurance that sufficient funds will be available to properly close and monitor the landfill. A closure/post-closure care plan is necessary to

provide information from which the amount of financial assurance required can be calculated. In determining the sufficiency of the plan for this purpose, the Agency must assess whether the proposed CPC care plan will minimize the need for further maintenance and will minimize or eliminate release of wastes from the landfill to the extent necessary to prevent threats to human health or the environment. (35 Ill. Adm. Code §807.502 (1986 Supp.).) The Board has determined that where a proposed CPC care plan fails to meet these goals, the Agency may either refuse to approve the plan by denying it as a permit application or it may impose conditions upon the plan as long as the conditions relate only to closure and post-closure care. Under Sexton's interpretation of the Act and Board regulations, the Agency would be limited to either approving or disapproving the proposed CPC care plan. As noted by the Board, an outright denial of the request for approval would require a new plan covering all aspects of closure/post-closure care and would place the facility in immediate violation of section 21.1 of the Act. We are not persuaded that the Board's interpretation of the request for closure/post-closure care plan approval as a permit application to which conditions may be attached is plainly erroneous.

Sexton next contends that the Board's decision affirming special conditions 4, 6, 17 and 19(b) was against the manifest weight of the evidence.

We will first address special conditions 6 and 17. Sexton maintains that it made out a *prima facie* case that its proposed CPC care plan was adequate with respect to leachate management and groundwater monitoring and that special conditions 6 and 17 were unnecessary. Sexton argues that the Agency, which did not present any evidence at the hearing, failed to rebut the *prima facie* case and that the Board's affirmance of the conditions was accordingly erroneous.

■ To prevail before the Board, Sexton had the burden of establishing that its proposed CPC care plan would not result in any future violations of the Act or the regulations and that the conditions imposed by the Agency were therefore unnecessary to accomplish the purposes of the Act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1039(a); *Browning-Ferris Industries of Illinois, Inc. v. Pollution Control Board* (1989), 179 Ill. App. 3d 598, 600, 534 N.E.2d 616.) Once Sexton had established a *prima facie* case that the conditions were unnecessary, it became incumbent upon the Agency to refute the *prima facie* case. (*Marathon Petroleum Co. v. Illinois Environmental Protection Agency* (1989), PCB 88—179; see also *Browning-Ferris*, 179 Ill. App. 3d 598, 534 N.E.2d 616.) The ultimate burden of proof that

the conditions were unnecessary, however, rested upon Sexton. *Browning-Ferris*, 179 Ill. App. 3d 598, 534 N.E.2d 616.

■ Upon review of Board decisions, this court must evaluate the evidence to determine whether the findings and conclusions of the Board were against the manifest weight of the evidence. (*Environmental Protection Agency v. Pollution Control Board* (1986), 115 Ill. 2d 65, 70, 503 N.E.2d 343.) A finding is against the manifest weight of the evidence if an opposite conclusion is clearly evident. *Burke v. Board of Review, Department of Labor* (1985), 132 Ill. App. 3d 1094, 1100, 477 N.E.2d 1351.

■ Essentially, Sexton argues that special conditions 6 and 17 were imposed because the Agency mistakenly believed that special wastes for which Sexton had received permits had actually been received and put into the landfill. To prove that the special wastes were not in the landfill, Sexton presented the testimony of Joseph R. Benedict, Jr., its director of regulatory affairs. Benedict testified that he had reviewed all of the documents concerning the landfill, including billing records and site logs, and stated that the special wastes were never received. The Board in its opinion found that although Sexton argued that the special wastes were not in the landfill, "Sexton presents no tangible evidence to this effect, and it does not direct the Board's attention to any affirmative assertion before the Agency that it did not accept these permitted wastes at the site." Neither in its opinion nor in its brief on appeal does the Board suggest what it means by "tangible" or "affirmative" evidence. Sexton presented expert testimony that its leachate management proposal and its groundwater-monitoring program were adequate to protect the environment and would not result in future violations of the Act. Sexton also presented evidence, through the testimony of a corporate officer who had examined all of Sexon's records, that the special wastes which formed the basis of the Agency's imposition of special conditions 6 and 17 were not in the landfill. In our view, Sexton established a *prima facie* case that these two special conditions were unnecessary. The Board's finding to the contrary was against the manifest weight of the evidence.

Rather than striking special conditions 6 and 17, as Sexton requests, we elect to remand these matters to the Board for further hearings and consideration. (107 Ill. 2d R. 335(h)(2); Ill. Rev. Stat. 1987, ch. 110, par. 3—111.) Although it is clear from the testimony of the Agency permit reviewer, James Schoenhard, that the conditions were imposed in large part because of his belief that the special wastes were in the landfill, the record is unclear as to whether this

belief was the sole basis supporting the conditions. Schoenhard did, for example, mention fluctuations in quarterly statistics that may have indicated inadequate background data. For that reason, we will remand this cause to the Board for further proceedings at which the Agency will have the opportunity to rebut Sexton's claim that the wastes are not in the landfill or to establish an independent basis supporting the necessity of special conditions 6 and 17.

Sexton also advances an alternate basis for striking special conditions 6 and 17. Sexton maintains that these conditions were based upon standards and criteria which were never lawfully adopted by the Board, such as the draft groundwater-monitoring network design guidelines referred to in special condition 17. The Agency has conceded that it cannot impose such draft documents as rules and the Board in its opinion stated that it did not "affirm or condone the imposition of any non-statutory, non-regulatory materials as permit requirements." The Agency maintains, however, that it was merely directing Sexton's attention to a readily available source for guidance. We cannot conclude from the record before us that the special conditions were attached in an effort to impose the Agency's draft guidelines as apart from other considerations. Further proceedings before the Board may serve to clarify this matter.

■■ Sexton then argues that the Board's decision to affirm special condition 4, which required Sexton to file a separate CPC care plan for gas control, was against the manifest weight of the evidence. Sexton interprets special condition 4 as requiring it to install a gas control system different from the one that is currently in place. We do not believe that Sexton's interpretation is justified. Schoenhard testified that the passive gas-flaring system proposed by Sexton was not necessarily denied but that the Agency needed further information as to how long gas would be produced at the site in sufficient volume to pose an environmental threat and as to how Sexton planned to close the system. Schoenhard explained that this information was necessary because if Sexton closed the system too soon, pressure from the gas could blow a hole through the containment. We do not believe that Sexton has established that the Agency's request for this information was unnecessary.

■■ Sexton next contends that the Board's decision to affirm special condition 19(b) was against the manifest weight of the evidence. Sexton asserts that the Agency's choice of the "over twice the background" test for triggering further evaluation of apparent groundwater data variations was arbitrary. Sexton's CPC care plan proposed further analysis where groundwater samples show "distinctive differ-

ences" from previous test results. Schoenhard testified that the term "distinctive differences" was subjective, and the Agency contends that it would invite disagreement over its meaning. Although Sexton attached the Agency's triggering mechanism as arbitrary, it failed to demonstrate that its own proposal would not result in any future violations of the Act. Nor has Sexton demonstrated in what manner it would be prejudiced by the Agency's imposition of special condition 19(b). Under these circumstances, we must affirm the imposition of special condition 19(b).

Accordingly, the order of the Pollution Control Board is affirmed in part, reversed in part and remanded to the Board for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded for further proceedings.

McMORROW, P.J., and JOHNSON, J., concur.