SIXTH DIVISION

May 22, 1998 

No. 1-96-4294

BENJAMIN BROWN, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) 95 CH 8421

)

CHICAGO PARK DISTRICT, ) 

PERSONNEL BOARD OF THE CHICAGO PARK ) The Honorable

DISTRICT, BECKY J. FREDERICK, ) John K. Madden,

Secretary of the Personnel Board, ) Judge Presiding.

)

Defendants-Appellants. )

JUSTICE GREIMAN delivered the opinion of the court:

The Personnel Board of the Chicago Park District (Board) appeals from an order of the circuit court reversing the Board's decision to deny back pay and benefits to plaintiff, Benjamin Brown.  We affirm the circuit court's order.

The Chicago Park District (Park District) charged plaintiff with misconduct based upon the following allegations:  (1) on August 2, 1989, plaintiff entered a building in Union Park after working hours with a nonemployee and used illegal drugs; (2) on August 3, 1989, plaintiff acted insubordinately when he refused to comply with his supervisor's order to take a fitness-for-duty evaluation; and (3) plaintiff threatened to physically harm a Park District security guard in an attempt to prevent the guard from testifying against him.  After a presuspension meeting, which was not transcribed, plaintiff was terminated from employment with the Park District. 
 

Plaintiff timely appealed the decision and requested a hearing.  For reasons that are not made clear in the record on appeal, that hearing was not held until February 23, 1994.  Mitchell Greene, a Park District security guard, testified that on August 2, 1989, at 1:45 a.m., he saw plaintiff and an unidentified woman in a Park District building with white powder on a table between them.  Greene caught the woman, but plaintiff ran out the door.  Greene also stated that plaintiff threatened to harm him and his family if he testified at the hearing.

Juan Rodriguez, cluster manager at Union Park, testified that the Union Park supervisor, Rich Boykin, filed an incident report identifying plaintiff as being involved in the August 2, 1989, incident.  Rodriguez testified that plaintiff reported for work on August 3, 1989.  About 2 p.m., Boykin informed Rodriguez that he thought plaintiff was "under the influence."  Rodriguez stated that he thought Boykin said plaintiff was talking slow and felt "like he wasn't there when he was talking to him."

Following his conversation with Boykin, Rodriguez called the internal investigations unit.  Rodriguez stated that, at this point, he did not know whether he would ask plaintiff to take a fitness-for-duty test, but he wanted witnesses.  Accompanied by two employees from the internal investigations unit, Rodriguez and Boykin encountered plaintiff.  After talking with plaintiff, Rodriguez concluded that Boykin's observations were correct, so he requested plaintiff to submit to a fitness-for-duty test.  According to Rodriguez, plaintiff was "a little slow in responding to questions" and his eyes "looked a little lazy."  

Rodriguez further testified that the previous night's incident was not the specific reason he sought out plaintiff, though he did acknowledge that it was important that he speak with plaintiff regarding that incident.  Rodriguez stated that the specific reason he sought out plaintiff was the information that Boykin relayed to him.  Rodriguez stated that he "just went on the information [he] got from the supervisor."  However, Rodriguez also stated that "[i]f [plaintiff] wasn't [under the influence] at the time or I didn't suspect him at the time, it would have ended right there."

Plaintiff informed Rodriguez that he would not submit to the fitness-for-duty test and Rodriguez told him that if he did not submit to the test, he would be insubordinate and an emergency suspension would be ordered.

Plaintiff testified that he began working for the Park District in 1974.  His usual work hours were from 7 a.m. to 3  p.m.  About 3 p.m. on August 3, 1989, plaintiff was on his way to the field house to sign out when he encountered Rodriguez, a man from the administration building, and two men from the investigation department.  Plaintiff could not recall the name of the person with whom he spoke, but stated that it was the man from the administration office and not Rodriguez.  The man informed plaintiff that he was being asked to take the test because of the August 2 incident and told plaintiff that any illegal substance would show up in his urine.  Plaintiff asked the man whether he looked drunk, whether anyone saw him taking anything, or whether he looked "high."  According to plaintiff, the man replied "no" and stated "they say they seen [
sic
] you in the building on the weekend." 

Plaintiff informed the man that it was time for him to leave for the day and that he had already made plans. Plaintiff was informed that he would be paid for the time it took to take the fitness-for-duty test.  Plaintiff argued with the man because the Park District had not paid him for his "F time" on prior occasions.  Furthermore, plaintiff stated that he did not want to take the test because the accusations against him were false.  Plaintiff also stated that his speech and the appearance of his eyes were normal for him.  He further stated that he was not in the boiler room, he never spoke to Greene after the incident, he did not call Greene's house and he did not know Greene's telephone number or where he lived.  Plaintiff stated that he did go to the park to speak with Greene to make certain Greene knew whom he was talking about.  However, a police officer told plaintiff to leave before he had an opportunity to speak with Greene.

The hearing officer determined that Greene was not a credible witness and found that plaintiff did not improperly enter park facilities or threaten Greene.  The hearing officer did find, however, that plaintiff's failure to obey a direct order of his supervisor constituted insubordination and recommended termination of plaintiff's employment with the Park District.

The hearing officer stated that the evidence showed that plaintiff's supervisor observed plaintiff and requested that Rodriguez order plaintiff to submit to a fitness-for-duty test.  Rodriguez also observed plaintiff and believed him to be under the influence.  The hearing officer found that Rodriguez stated sufficient grounds to require plaintiff to submit to a fitness-for-duty evaluation and that plaintiff's disagreement with Rodriguez's observations and conclusions was insufficient to "render his supervisor's order to submit to a test invalid and therefore did not excuse [plaintiff's] failure to obey said order."   The hearing officer concluded that although Park District policies required Rodriguez to provide written reasons for requiring plaintiff to submit to a fitness test, Rodriguez's failure to do so did not render void his direct order to plaintiff to submit to the test.  The hearing officer found plaintiff guilty of insubordination, noted that he had previously been suspended for 18 days in 1982 and for 4 days in 1975, and recommended plaintiff's termination.

Plaintiff appealed.  The Board did not immediately schedule a hearing to consider plaintiff's claim.  Plaintiff filed an action in 
mandamus
, and the Park District was ordered to reach a final decision by February 28, 1995.
(footnote: 1)  At the Board's request, plaintiff later agreed to extend this date until March 31, 1995. 

The Board first considered the case on February 22, 1995.  At that hearing, the hearing officer recounted his findings and stated that Greene's testimony was "contrived" and he was not a believable witness.  The hearing officer also stated:  

"I thought that under the guidelines, as long as Mr. Rodriguez set forth reasonable grounds, that was sufficient.  I did not have to find that, in fact, on that date and at that time [plaintiff] was slow or had hazy eyes. 

***

I could not possibly do that."

Ricardo Losa, a representative of plaintiff's union, stated that the union contract required timely and progressive discipline and that this hearing, 5 1/2 years after the incident, could not be considered timely.  According to Losa, Rodriguez, who was an experienced supervisor in the Park District, knew the correct procedure to request the fitness-for-duty test and did not follow it.  "[I]n the eyes of the union," the request to take the fitness-for-duty test was not reasonable because it was not documented.   

The Board decided to "reopen" the matter and continued the hearing until March 14, 1995.  On that date, the Board considered the circumstances surrounding the request for plaintiff to submit to the fitness-for-duty test.  The hearing officer recounted his findings and his interpretation of the Park District policies.  After a recess, secretary Frederick stated that, as the secretary of the Personnel Board, she was prepared to report what the Board was "prepared to do in terms of ruling on this [matter]," stating:

"[W]e feel strongly that the testimony taken was not strong enough to convince this board, in fact, that [plaintiff's] request to be reinstated is improper, and, in fact, this board is prepared today to make the motion to reinstate [plaintiff] *** with a couple of understandings very clearly, that he would be placed on a one-year probationary period and that there will be no back-pay awarded."

Plaintiff argued that he was entitled to back pay because he was unjustly terminated.  The Park District argued that if the Board did decide to award back pay to plaintiff, it should be done on a nonprecedential basis to avoid "the floodgate that would open as a result of this if it were held as a precedent for other cases."  The Board instructed the parties to prepare arguments on the back pay issue.  Plaintiff was reinstated at that time.

Although plaintiff's employment with the Park District was terminated on August 3, 1989, and he was not reinstated until February 22, 1995, he requested back pay only for the time period of August 3, 1989, to March 31, 1991, because he received social security income during the remainder of the time period.  Plaintiff argued that he was entitled to back pay because he was unlawfully terminated.  The Park District argued that plaintiff was legally terminated and the Board "merely exercised its authority to reject" the hearing officer's recommendation that plaintiff be terminated for his insubordination.  The Park District argued that if back pay and benefits were awarded, it should be done on a nonprecedential basis to preclude a 

"deluge of similarly-based claims in the future that would further lengthen the time needed to finally resolve such cases, and which would likely open a floodgate of new as well as retroactive claims, any number of which would be frivolous, and all of which would further burden an already backlogged system." 

On August 3, 1995, the Board issued a written order, stating: 

"[H]aving heard the Hearing Officer's recommendation that the charges resulting in termination be sustained, the Board moved to reject that recommendation.  The Chicago Park District has reinstated the employee to the payroll.  The Board rejects the request for one year and seven months of back pay, and grants the request for restoration of seniority."

Plaintiff sought judicial review of this order, and on August 23, 1996, the circuit court remanded this cause to the Board for clarification of its finding regarding plaintiff's insubordination.   On September 19, 1996, the Board issued an amended order
(footnote: 2) adopting the "recommended decision of the hearing officer to the extent that he found [plaintiff] acted insubordinately when he refused a direct order of his superior to take a fitness-for-duty drug test."  The Board found that the insubordination justified the "maximum penalty of immediate termination for the first offense," but it rejected the recommendation of termination "given all the factors surrounding [plaintiff's] insubordination."  The Board ordered plaintiff reinstated "subject to a suspension for his insubordination from the date of his discharge to the date of his reinstatement."  The Board found that plaintiff was not entitled to any back pay or benefits for the time period that he was suspended, but granted his request for restoration of seniority.

On December 2, 1996, the circuit court found that the Board violated its fitness-for-duty and code of conduct policies.  The circuit court concluded that the Park District policies required the supervisor to document his reasons for requesting that an employee submit to a fitness test.  Because Rodriguez failed to comply with these policies, plaintiff was not required to submit to the fitness-for-duty test.  Therefore, he should not have been suspended or terminated from employment.  Accordingly, the circuit court reversed the Board's amended order and awarded plaintiff back pay and benefits for the period of August 3, 1989, through March 31, 1991.  Enforcement of the circuit court order has been stayed pending the outcome of this appeal.

Resolution of this matter is dependent upon the interpretation of Park District policies, including the fitness-for-duty policy, the "Code of Conduct," and the "Guidelines for Discipline."  A memo dated March 28, 1989, from the executive vice president to Park District employees, apprised employees of these policies, stating:

"The Code of Conduct and the Guidelines for Discipline give employees and their supervisors notice as to what conduct is acceptable and what disciplinary action should be taken when an employee fails to perform in accord with this code.  * * *.  

The Fitness-for-Duty policy and procedures describe in detail the procedures to be taken when it appears that an employee is not fit for duty, particularly due to the use of alcohol or drugs.  This policy and procedures 
will streamline the handling of these problems, while fully protecting the employee who is being evaluated."  

 Under the heading "Duty of Supervisor to Require Fitness-For-Duty Evaluation," the fitness-for-duty policy states that a supervisor "shall refer an employee for a fitness-for-duty evaluation" when he has a "reasonable suspicion" that the employee is under the influence of drugs or alcohol.

Under the heading "Procedure for Referral" the fitness-for-duty policy states:

"The supervisor must complete Part A of the 'Request and Authorization' form and the designated part of the evaluation form with the reasons for his/her suspicion of the inability of the employee to safely and properly perform his/her work duties."

Part A of the "Request and Authorization for Fitness-For-Duty Evaluation" is addressed to the Chicago Park District or the hospital designated to perform the evaluation.  Part A has spaces for the employee's name, the supervisor's name, and the jobsite and states:

"Please evaluate his/her [
sic
] employee for Fitness-for-Duty.  An employee is unfit for duty if his/her physical and/or mental condition are such that his/her judgment and/or mental or physical ability to safely and efficiently perform his/her job duties are impaired." 

Part A also has a checklist entitled "Reasons for Request."  The checklist included such factors as drowsiness, odor of alcohol on breath, slurred speech, lack of coordination in walking, unexplained accident.  Part A is to be signed and dated by the supervisor and a witness.  Part C of the form is a consent form to be signed by the employee and a witness.

Under the heading "Duty of Employee to Submit to Fitness-For-Duty Evaluation," the policy provides that an employee is 

"obliged to report to the Medical Department, the Office of Inspections and Investigations or to a selected hospital for a fitness-for-duty evaluation which may include testing for drug levels in the body at any time when referred by his/her supervisor."

Under the heading "Refusal by Employee to Submit to Fitness-For-Duty Evaluation," the policy provides: 

"If an employee refuses to submit to a fitness-for-duty evaluation, including a drug test as part of that evaluation, or to sign a release of information to the Chicago Park District, the employee will be subject to disciplinary action, including termination of employment."

Section I of the Park District's Code of Conduct provides that an employee shall obey supervisory orders properly given in the course of employment.  Section II of the Code of Conduct, entitled "Alcohol & Drugs," states:

"An employee, on a direct order of his/her supervisor or other employee in the line of supervision, shall submit to testing for drugs and/or alcohol and shall accompany personnel escorting him/her to a site for such testing, provided that his/her behavior, demeanor or speech provides reasonable basis for suspecting that he/she has been drinking or using drugs on duty or that he/she is intoxicated while on duty from use of drugs or alcohol.  The supervisor shall record in writing his/her specific reasons for believing that the employee was intoxicated while on duty or had ingested drugs or alcohol while on duty."

The "Guidelines for Discipline" sets forth a table delineating sanctions that are deemed appropriate for specified acts of misconduct.  Group A misconduct includes: 

"refusal, on direct orders of a superior, to submit to testing for drugs and/or alcohol or to accompany personnel escorting him or her to a site for such testing, provided that his or her behavior, demeanor or speech provides reasonable basis for suspecting  that he or she has been drinking or using drugs on duty or that he or she is intoxicated from alcohol or under the influence of drugs while on duty." 

Absent mitigating circumstances, the penalty for group A misconduct is termination for the first offense.

The Park District now appeals the order of the circuit court.  The issues on appeal are (1) whether plaintiff could be found insubordinate for refusing to submit to a fitness-for-duty test under Park District policies where his supervisor failed to document his reasons for asking plaintiff to take the test; (2) whether the Board made the requisite finding that Rodriguez had a reasonable basis to ask plaintiff to submit to the test; (3) whether that finding was against the manifest weight of the evidence; and (4) whether imposition of a six year suspension was arbitrary, capricious, or unrelated to the requirements of plaintiff's employment.

An administrative agency's interpretation of its own rules and regulations is entitled to "respectful consideration" 
(
Board of Trustees of the University of Illinois v. Illinois Educational Labor Relations Board
, 274 Ill. App. 3d 145, 152 (1995)), and will not be overruled unless clearly erroneous, arbitrary or unreasonable (
Water Pipe Extension, Bureau of Engineering, Laborers Local 1092 v. Illinois Local Labor Relations Board
, 252 Ill. App. 3d 932, 936 (1993)).  An agency's interpretation of a rule is not, however, binding on this court (
Inwang v. Community College District No. 508
, 117 Ill. App. 3d 608, 611 (1983)), which must engage in an independent analysis with respect to questions of law (see 
Board of Education of Round Lake Area Schools, Community Unit School District No. 116 v. State Board of Education
, 292 Ill. App. 3d 101, 109-111 (1997); 
Cook County State's Attorney v. Illinois State Labor Relations Board
, 292 Ill. App. 3d 1, 6-7 (1997)).  

"Courts apply the same rules of construction used in construing statutes when interpreting the meaning of an agency rule."  
Board of Trustees
, 274 Ill. App. 3d at 153.  "Each provision must be construed in connection with every other provision to produce a harmonious whole."  
White
 v. Department of Employment Security
, 264 Ill. App. 3d 851, 854 (1994).  In determining the intent of the drafters in adopting a regulation, a court may consider the language used, the reason and necessity for the regulation, the evil sought to be remedied and the purpose to be achieved.  
John Sexton Contractors Co. v. Pollution Control Board
, 201 Ill. App. 3d 415, 424 (1990), citing 
Stewart v. Industrial Comm'n
, 115 Ill. 2d 337, 341 (1987).  The language of an administrative regulation is to be given its ordinary meaning.  
Linderman v. Illinois Civil Service Comm'n
, 188 Ill. App. 3d 554, 557 (1989).

Plaintiff argues that Park District policies require supervisors to document a reasonable basis for requesting an employee to take a fitness test.  Absent such documentation, an employee is not required to submit to a fitness test and cannot be disciplined for his refusal to submit to testing.

Section II of the Code of Conduct, titled, "Alcohol & Drugs," provides that an employee "shall" submit to testing when given a direct order to do so, provided that there is a reasonable basis for suspecting that the employee has been using drugs or alcohol.  The same section states that the supervisor "shall record in writing his/her specific reasons for believing" that the employee was using drugs or alcohol.  Clearly, this language imposes a duty on supervisors to make a written record of their observations.  Under these sections and in light of the policies as a whole, we believe that a supervisor is required to document his or her reasons for asking an employee to submit to the fitness-for-duty test before an employee can be found insubordinate for refusing the testing.

The fitness-for-duty policy also states that a supervisor "shall refer an employee for a fitness-for-duty evaluation" when he has a "reasonable suspicion" that the employee is under the influence of drugs or alcohol.  The section entitled "Procedure for Referral," states that the supervisor "must complete Part A of the 'Request and Authorization' form and the designated part of the evaluation form" by recording the reasons why the employee is being asked to take the test.  Part A of the "Request and Authorization" form is a checklist of observable symptoms that would indicate that a person was using drugs or alcohol, such as slurred speech and lack of coordination.  It is to be signed by the supervisor and a witness.  Part C of the form is a consent form requiring the employee's signature.  These provisions provide further support for our conclusion that the policies require the supervisor to provide a written reasonable basis before an employee can be required to submit to a fitness-for-duty test.  The supervisor must complete this form to properly refer an employee for the testing under the policies.

Moreover, the March 28, 1989, memo states that the fitness-for-duty policy and procedures "will streamline the handling of these problems, while fully protecting the employee who is being evaluated."  We find this policy statement definitive to our interpretation.  The fitness-for-duty policies were developed to ensure that workers were not operating under the influence of alcohol or drugs while performing their employment duties.  The very detailed procedures for actually directing such tests were adopted to streamline the process and to protect employees from unreasonable invasions of their privacy when handling these matters.  In the interests of protecting the employees' privacy, the creation of these specific directives can only be interpreted as to require supervisors to have a reasonable basis and to document that basis before requiring an employee to submit to a fitness-for-duty test.

The Park District argues that the provisions requiring a supervisor to document his or her reasons for requesting the fitness-for-duty test are merely an "independent obligation" imposed on supervisors, and any supervisor who violates the policies would be subject to discipline.  We do not find this a reasonable interpretation of the policies.  Under such interpretation, a supervisor could ignore the policies and direct an employee to submit to the testing without providing reasons for the testing.  While such a supervisor could then be found in violation of the policies, the policies would provide no protection to employees against unreasonable requests for testing and therefore defeat one of the clear, and we believe important, purposes of the policies.

We conclude that the Park District's policies at issue in this case require that a supervisor provide a written basis for requesting a fitness-for-duty test.  Plaintiff could not be found insubordinate for failing to submit to a fitness-for-duty test where his supervisor failed to follow the specific directives of the Park District.

We therefore affirm the judgment of the circuit court.  Because this issue disposes of the matter, we need not address the remaining issues.

Affirmed.

CAMPBELL, P.J., and QUINN, J., concur.

FOOTNOTES
1:
This order has not been included in the record on review.  The Park District does not dispute that a 
mandamus
 action was filed, but makes no reference as to its ultimate resolution.

2:
Although appellant failed to include the Board's amended order in the record on appeal, both parties have included copies of the order in their briefs, and they do not dispute its contents.  Therefore, pursuant to 
Ray v. Winter
, 67 Ill. 2d 296, 302-03 (1977), we will amend the record on appeal to include the order.