THE ENVIRONMENTAL PROTECTION AGENCY, Petitioner and Cross-Respondent, v. JERSEY SANITATION CORPORATION, Respondent and Cross-Petitioner (The Pollution Control Board, Respondent).

Fourth District   No. 4—02—0319

▮▮▮▮

Argued November 20, 2002.—Opinion filed January 29, 2003.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Brian F. Barov (argued), Assistant Attorney General, of counsel), for petitioner.

Stephen F. Hedinger (argued), of Hedinger Law Office, of Springfield, for respondent Jersey Sanitation Corporation.

Marie E. Tipsord (argued), Special Assistant Attorney General, of Chicago, for respondent Pollution Control Board.

JUSTICE TURNER delivered the opinion of the court:

In February 1993, petitioner, the Illinois Environmental Protection Agency (IEPA), approved a landfill closure plan for respondent, Jersey Sanitation Corporation (Jersey). In June 1999, Jersey sought a supplemental permit governing facility closure certification. In October 1999, the IEPA granted the supplemental permit with conditions. In January 2000, Jersey filed a petition for review of the permit conditions with respondent, the Pollution Control Board (Board). In December 2000, Jersey filed a motion for summary judgment, arguing the imposed conditions were unnecessary; and in June 2001, the Board granted the motion (*Jersey Sanitation Corp. v. Illinois Environmental Protection Agency*, Ill. Pollution Control Bd. Op. 00—82 (June 21, 2001)). In August 2001, the IEPA filed a motion to reconsider, which the Board denied along with Jersey's motion to strike (*Jersey Sanita-*

*tion Corp. v. Illinois Environmental Protection Agency*, Ill. Pollution Control Bd. Order 00—82 (September 20, 2001)).

Pursuant to section 41(a) of the Illinois Environmental Protection Act (Act) (415 ILCS 5/41(a) (West 2000)) and Supreme Court Rule 335 (155 Ill. 2d R. 335), the IEPA brings this direct review of the Board's decision. The issues are whether the Board erred (1) in striking the conditions imposed on Jersey's supplemental permit and (2) in reviewing the conditions that the IEPA claims were waived by Jersey's untimely objections. In its cross-appeal, Jersey argues the Board erred in denying Jersey's motion to strike the IEPA's motion for reconsideration based on its alleged untimely filing. We affirm the Board's decision in the IEPA's appeal as well as its decision denying Jersey's motion to strike in Jersey's cross-appeal.

## I. BACKGROUND

The Jersey landfill is a 10-acre site located in Jersey County, Illinois, that opened in 1967. The landfill stopped accepting waste in September 1992, and a final cover/vegetative layer was applied in September 1994. In February 1993, the IEPA approved Jersey's closure plan for the landfill and issued supplemental permit No. 1992—350—SP. The permit approved a revised closure and postclosure care plan and cost estimates along with a groundwater monitoring plan.

In June 1999, Jersey submitted an application for a supplemental permit that sought facility closure certification and included closure and postclosure plans along with cost estimates. In the application for permit, Jersey stated, in part:

> "Groundwater monitoring results will be evaluated each quarter against background data, [g]eneral [u]se [w]ater [q]uality [s]tandards, and other historic water analysis information. If a trend is believed to be developing, more frequent sampling (e.g.[,] monthly) may be performed to substantiate or dismiss the likelihood of site impact. A professional engineering firm should be retained to develop future actions and/or plans for subsequent IEPA approval."

In October 1999, the IEPA granted Jersey supplemental permit No. 1999—209—SP with conditions approving closure certification.

In January 2000, Jersey filed a petition for review of permit conditions with the Board, seeking review and deletion of certain conditions imposed by the IEPA to the 1999 supplemental permit. Specifically, Jersey objected to the following conditions as unnecessary to accomplish the Act's purpose and inconsistent with the Board's regulations:

> "A. *Closure Certification*
>
> * * *
>
> 4. Current, valid [p]rior [c]onduct [c]ertification is required to conduct post[ ]closure care.

B. *Post[c]losure Care*

\* \* \*

6. Prior to the [IEPA] issuance of a completion of post[ ]closure care certificate, the operator shall provide the following:

\*\*\*

b. An analysis for the 35 Ill. Adm. Code [§§ ]620.410(a) & (b) [(West CD-ROM March 26, 1999)] parameters, excluding radio nuclides, of all permitted upgradient and downgradient wells and assess the landfill's impact on groundwater by comparing the groundwater analysis results to the appropriate 35 ILL. ADM. CODE 620 Subpart D Groundwater Standards. [Citation to permit.]

\*\*\*

C. *Monitoring*

1. Your water monitoring program is approved in accordance with Attachments A through E of Permit No. 1992—350—SP, and is subject to the conditions contained therein.

2. The operator shall provide the statistical background concentration limits used to evaluate the groundwater quality. In accordance with special condition [N]o. 4 of Attachment A to Permit No. 1992—350—SP, groundwater quality shall be evaluated by comparing analytical quantities to pooled upgradient (interwell) and each well[']s (intrawell) statistical confidence limits. The statistical confidence limits (both interwell and intrawell) are to be established using the first four consecutive quarters of sampled data obtained at the inception of monitoring. The statistical results, data, and methodology shall be submitted to the [IEPA] in the form of a supplemental permit application no later than December 31, 1999.

3. The operator shall supply the [IEPA] with all sampling and analysis procedures used in providing a reliable indication of groundwater quality in the zone being monitored. Also, the operator shall provide an evaluation of the groundwater exceedances reported in the February 9, 1999[,] groundwater monitoring report, received April 2, 1999. The concentration levels for arsenic, iron, manganese, sulfate, TDS, TOC, and TOX in wells G104, G105, and G106 are above 620 Class I Standards. The evaluation shall include the comparison of the established background confidence limits to concentration levels of these parameters, a historical trend analysis of the data, groundwater flow maps over the last four consecutive monitoring quarters and, if necessary, an assessment monitoring plan in accordance with special condition [N]o. 8(b) of Attachment A to Permit No. 1992—350—SP. This information shall be submitted to the [IEPA] in the form of a supplemental permit application no later than December 31, 1999.

4. During the post[ ]closure care period, the owner and operator

shall monitor gas, water[,] and settling and shall take whatever remedial action is necessary to abate any gas, water[,] or settling problems which appear during that time. Post[ ]closure groundwater monitoring shall be conducted and reported to the [IEPA] on a quarterly basis for the monitoring wells and parameters identified in Attachment A of Supplemental Permit No. 1992—350—SP.

\* \* \*

8. During the post[ ]closure care period, water quality records shall be maintained at the office of the site operator and shall be review quarterly. A water quality report shall be submitted quarterly. If the owner/operator or the [IEPA's] Bureau of Land determines that adverse trends are developing, further investigation is to be performed. If corrective action becomes necessary, a plan is to be developed by the operator and submitted to the Permit Section, Bureau of Land for approval."

In December 2000, Jersey filed a motion for summary judgment, arguing the conditions in the 1999 supplemental petition were not necessary to accomplish the purposes of the Act and were inconsistent with Board regulations applicable to Jersey's facility because they were not required by the Illinois Administrative Code (Code). The IEPA argued Jersey waived its right to object to groundwater monitoring conditions because it had agreed to them in the 1992 supplemental permit.

In June 2001, the Board granted Jersey's motion. *Jersey Sanitation Corp. v. Illinois Environmental Protection Agency*, Ill. Pollution Control Bd. Op. 00—82 (June 21, 2001). The Board agreed with Jersey that the closure and postclosure care of the facility was governed by Part 807 of Title 35 of the Code. 35 Ill. Adm. Code § 807 (Conway Greene CD-ROM April 1, 2001). The Board also found Jersey had not waived its objection to the conditions imposed in a postclosure care permit. In granting the motion, the Board ordered the conditions in question be stricken and removed from the permit, as the Act or Board regulations would not be violated absent those conditions.

On August 14, 2001, the Board received the IEPA's motion for reconsideration. The motion to reconsider was filed by United States mail and was postmarked August 1, 2001. On August 20, 2001, Jersey filed a motion to strike the IEPA's motion for reconsideration, arguing the motion was not timely filed. In September 2001, the Board denied both the motion to strike and the motion to reconsider. In October 2001, the IEPA filed a petition for direct review. In November 2001, Jersey filed a cross-petition for review.

## II. ANALYSIS

### A. Jersey's Cross-Appeal

In its cross-appeal, Jersey argues the Board erred in denying its

motion to strike the IEPA's motion for reconsideration as untimely, leaving this court without jurisdiction. We disagree.

On June 21, 2001, the Board granted Jersey's motion for summary judgment. In its motion for reconsideration, the IEPA alleged it received the Board's opinion and order on June 27, 2001. On August 14, 2001, the Board received the IEPA's motion for reconsideration. The certificate of service filed with the IEPA's motion was dated August 1, 2001. On August 20, 2001, Jersey filed its motion to strike, arguing that pursuant to the Board's procedural rules any motion for reconsideration of a final Board order must be filed within 35 days after the receipt of the order. Jersey alleged the IEPA's motion for reconsideration was filed by United States mail after the filing deadline of August 1, 2001. Jersey also argued that because the filing deadline was August 1, 2001, a filing postmarked August 1, 2001, was not timely filed because the postmark did not precede the filing deadline. The Board denied Jersey's motion to strike.

■ As this issue relates to the interpretation of administrative rules and regulations and the facts are undisputed, questions of law persist, and this court reviews such questions *de novo. Panhandle Eastern Pipe Line Co. v. Environmental Protection Agency,* 314 Ill. App. 3d 296, 300, 734 N.E.2d 18, 21 (2000). "Rules and regulations promulgated by the Board have the force and effect of law, are presumed to be valid, and will be construed by the same standards as statutes." *Granite City Division of National Steel Co. v. Illinois Pollution Control Board,* 155 Ill. 2d 149, 162, 613 N.E.2d 719, 724 (1993).

■ The Board's rules require a motion for reconsideration be filed within 35 days of the date of service of its final order. 35 Ill. Adm. Code § 101.520 (Conway Greene CD-ROM April 1, 2001). " 'Filing' means the act of delivering a document or article into the custody of the [c]lerk with the intention of incorporating that document into a proceeding or record before the Board." 35 Ill. Adm. Code § 101.202 (Conway Greene CD-ROM April 1, 2001). Section 101.300(b)(2) of Title 35 of the Code provides that "[i]f a document is filed by [United States] Mail subsequent to a filing deadline, yet the postmark date precedes the filing deadline, the document will be deemed filed on the postmark date." 35 Ill. Adm. Code § 101.300(b)(2) (Conway Greene CD-ROM April 1, 2001).

■ In this case, we agree with the arguments set forth by the Board and the IEPA that the Board's rule allows filing by mail on the due date. Section 101.300 of Title 35 of the Code indicates the computation of any period of time runs "until the close of business on the last day." 35 Ill. Adm. Code § 101.300(a) (Conway Greene CD-ROM April 1, 2001). Further, all documents must be filed with the

Board's clerk's office in Chicago. 35 Ill. Adm. Code § 101.302(b) (Conway Greene CD-ROM April 1, 2001). Considering the Board's rules that the deadline's time computation runs until the close of business on the last day, that being the thirty-fifth day, a motion postmarked on that thirty-fifth and final day would fall within the filing deadline. If, as Jersey argues, the date for filing by mail was the day before the deadline, here July 31, 2001, those unable to physically travel to the Board's office in Chicago would in reality have a 34-day time limit to file their motion to reconsider. Such a result runs afoul of the Act's purpose of establishing "a unified, state-wide program." 415 ILCS 5/2(b) (West 2000).

The Board "has the power to construe its own rules and regulations to avoid absurd or unfair results." *Village of Fox River Grove v. Pollution Control Board*, 299 Ill. App. 3d 869, 880, 702 N.E.2d 656, 664 (1998). In its ruling here, the Board held that "[t]o rule that a filing cannot be mailed on the 35th day would defeat the purpose of the Board's procedural rule that allows filings to be mailed to the Board." *Jersey Sanitation Corp. v. Illinois Environmental Protection Agency*, Ill. Pollution Control Bd. Order 00—82, slip order at 2 (September 20, 2001). We find the Board's interpretation of its rule correct; otherwise, the result would work an unfairness to those finding it necessary to mail their motion instead of personally delivering it to Chicago. Accordingly, the Board did not err in denying Jersey's motion to dismiss the IEPA's motion for reconsideration, and we therefore have jurisdiction. We affirm the Board's decision denying Jersey's motion to dismiss, which is the subject of Jersey's cross-appeal.

## B. Standard of Review

■ Initially, we must decide the proper standard of review regarding the Board's decisions concerning waiver and the supplemental permit conditions. The IEPA argues these issues require this court to employ a *de novo* and clearly erroneous standard of review, respectively. Jersey and the Board, on the other hand, argue the standard to apply is the manifest weight of the evidence. We agree with Jersey and the Board.

Section 41(b) of the Act provides, in part:

"Any final order of the Board under this Act shall be based solely on the evidence in the record of the particular proceeding involved, and any such final order for permit appeals, enforcement actions[,] and variance proceedings, shall be invalid if it is against the manifest weight of the evidence." 415 ILCS 5/41(b) (West 2000).

Our supreme court, in construing section 41(b) of the Act, stated the appellate court had the duty under that section

"to evaluate all the evidence in the record, and to determine

whether the Board's findings that the evidence did not support the denial of the permits were contrary to the manifest weight of the evidence. The court did not reweigh the evidence or substitute its judgment for that of the Board. Instead, it conducted a thorough and independent review of the record and concluded that the Board's determinations were not contrary to the manifest weight of the evidence." *Environmental Protection Agency v. Pollution Control Board*, 115 Ill. 2d 65, 70, 503 N.E.2d 343, 345-46 (1986).

Other appellate courts have followed the supreme court's directive and applied the manifest weight of the evidence standard when reviewing the Board's permit decisions. See *Community Landfill Co. v. Pollution Control Board*, 331 Ill. App. 3d 1056, 1060, 772 N.E.2d 231, 234 (2002) (Third District: Board's affirmance of IEPA's denial of supplemental permit application would be reversed only if against the manifest weight of the evidence); *ESG Watts, Inc. v. Pollution Control Board*, 286 Ill. App. 3d 325, 330, 676 N.E.2d 299, 302-03 (1997) (Third District: applying manifest weight of the evidence standard in reviewing Board's decision); *Browning-Ferris Industries of Illinois, Inc. v. Pollution Control Board*, 179 Ill. App. 3d 598, 602, 534 N.E.2d 616, 619 (1989) (Second District: review of Board's findings regarding modifications imposed by IEPA was subject to manifest weight of the evidence standard). Thus, our review of the Board's decision regarding the conditions in the supplemental petition and Jersey's alleged waiver will be based on the manifest weight of the evidence standard.

## C. Waiver

The IEPA argues the Board erred in finding Jersey did not waive the right to challenge certain conditions imposed in the 1999 supplemental petition. Specifically, the IEPA argues conditions C.1 through C.4 and C.8, imposed in the 1999 supplemental permit, were duplicate conditions previously imposed on Jersey in 1992, and Jersey's failure to challenge those conditions in 1992 results in waiver of its objections at this time. We disagree.

■ If the IEPA grants a permit with conditions under the Act, "the applicant may, within 35 days, petition for a hearing before the Board to contest the decision of the [IEPA]." 415 ILCS 5/40(a)(1) (West 2000). Here, the Board found Jersey had not waived its objections; instead it found Jersey's facility was "at a very different place in its history and a condition that may have been appropriate during the operation of the facility may not be appropriate during the post[ ]closure care period."

The IEPA relies on several cases for its argument that once a condition is imposed in a permit and no appeal is made to the Board, an appeal of that permit condition may not be taken in a subsequent

permit. We find, however, the cases to be distinguishable and conclude Jersey did not waive its right to challenge the conditions included in the postclosure permit.

In *Panhandle Eastern Pipeline Co. v. Environmental Protection Agency*, Ill. Pollution Control Bd. Op. 98—102 (January 21, 1999), *aff'd*, 314 Ill. App. 3d 296, 734 N.E.2d 18 (2000), Panhandle Eastern Pipeline Company (Panhandle) filed an application in September 1987 with the IEPA for a permit to replace compressor engines used to recompress natural gas. In February 1988, the IEPA issued a permit for the construction project with conditions limiting the amount of emissions. In August 1996, an IEPA inspector discovered Panhandle was exceeding the emission limit established in the February 1988 construction permit. In response, Panhandle sent the IEPA a proposed compliance commitment agreement along with a new construction permit application. Panhandle sought to increase the emission standards established in the February 1988 permit. In December 1997, the IEPA denied Panhandle's permit application.

In its appeal to the Board, Panhandle argued the 1988 permit requirements were invalid because the limits were incorrectly calculated and the 1988 permit did not have an enforceable limit. The Board, however, held it could not review the IEPA's 1988 permit determination. The Board stated Panhandle sought an increase in the limits after belatedly realizing the original plans could not accommodate the original permit limit. The Board then affirmed the IEPA's denial of the permit.

In *Bradd v. Illinois Environmental Protection Agency*, Ill. Pollution Control Bd. Op. 90—173 (May 9, 1991), the IEPA issued a supplemental permit approving Bradd's closure and postclosure plan and cost estimates for his landfill on October 14, 1988. Special conditions were also required of Bradd, including special condition 15(b) requiring Bradd to submit a supplemental permit application proposing a groundwater monitoring program for the landfill to conform with IEPA guidelines within 90 days of the original permit. On January 13, 1989, Bradd filed a supplemental permit application proposing a revised groundwater monitoring program, which the IEPA denied on April 6, 1989. On June 29, 1990, Bradd filed an affidavit for certification of closure, which the IEPA rejected on April 21, 1990, for lack of compliance with its previously approved closure plan.

Bradd asked the Board to reverse the IEPA's decision rejecting his affidavit for certification of closure claiming his groundwater monitoring plan was adequate. The Board found Bradd never appealed special condition 15(b) or the IEPA's denial of his proposed groundwater monitoring program within the 35-day time frame required by the

Act. The Board found Bradd waived any objection on that issue and would not review it because "[t]o do otherwise would encourage permit applicants to delay appealing an [IEPA] denial until a subsequent denial appeal arises."

In *Centralia Environmental Services, Inc. v. Illinois Environmental Protection Agency*, Ill. Pollution Control Bd. Op. 89—170 (October 25, 1990), the IEPA issued Centralia Environmental Services, Inc. (CESI), an operating permit for areas II and III of CESI's landfill facility on March 21, 1988. One condition imposed by the IEPA stated "no operating permits for additional areas of this landfill will be issued by the [IEPA] until an [IEPA] approved remedial action plan is satisfactorily implemented pursuant to an issued supplemental development plan." *Centralia Environmental Services, Inc. v. Illinois Environmental Protection Agency*, Ill. Pollution Control Bd. Op. 89—170 (October 25, 1990). CESI did not contest this issue at that time. On June 29, 1989, CESI submitted a supplemental development permit application as required. The IEPA, however, denied the application. On August 25, 1989, CESI submitted an application for a supplemental operating permit for area IV despite the conditions issued by the IEPA in March 1988. The IEPA denied the application in October 1989.

In its petition to review, CESI requested the Board to strike the requirement that CESI could not receive an operating permit for area IV until it had met its condition through a supplemental development plan. The Board, in reviewing section 40(a)(1) of the Act, found CESI had waived its right to challenge the IEPA's imposition of the conditions because two years had passed since the IEPA issued the permit.

■ In the case *sub judice*, the IEPA determined Jersey's facility had been closed in accordance with the closure plan. The minimum 15-year postclosure care period began in September 1994. Unlike in *Panhandle*, Jersey's landfill is no longer in operation. Further, Jersey's appeal of the conditions imposed in the 1999 supplemental permit is neither an attempt to avoid compliance with regulations nor a belated attempt to alter the scope of the 1992 permit. In contrast to *Bradd*, where the IEPA rejected Bradd's affidavit for certification of closure, the IEPA issued the certification of closure to Jersey indicating compliance with the closure plan. Jersey is now seeking review of the conditions imposed on the postclosure care permit, a different type of permit as characterized by the Board. Likewise, the facts in *Centralia* involved a permit denial of an operating landfill and conditions regulating further operating permits. Here, Jersey has passed the closure phase, and the conditions imposed in the postclosure care permit are appropriate for Jersey to challenge. Thus, the Board correctly found Jersey had not waived its objection to the conditions in the postclosure care permit.

## D. Supplemental Permit Conditions

■ The IEPA argues the Board erred in striking the conditions imposed in the 1999 supplemental petition. We disagree.

Permits are granted by the IEPA pursuant to section 39 of the Act, which states, in part:

"When the Board has by regulation required a permit for the [operation of a landfill facility], the applicant shall apply to the [IEPA] for such permit and it shall be the duty of the [IEPA] to issue such a permit upon proof by the applicant that the facility *** will not cause a violation of this Act or of regulations hereunder." 415 ILCS 5/39(a) (West 2000).

The Act also states that when granting permits, the IEPA "may impose such conditions as may be necessary to accomplish the purposes of this Act, and as are not inconsistent with the regulations promulgated by the Board hereunder." 415 ILCS 5/39(a) (West 2000). To prevail on its claim, the petitioner must show the IEPA's imposed modifications "were not necessary to accomplish the purposes of the Act, or, stated alternatively, [the petitioner] had to establish that its plan would not result in any future violation of the Act and the modifications, therefore, were arbitrary and unnecessary." *Browning-Ferris*, 179 Ill. App. 3d at 603, 534 N.E.2d at 620.

### 1. *Prior Conduct Certification*

Although the IEPA does not appeal the Board's decision to strike condition A.4, we find it necessary to detail the Board's decision to provide background for the rest of our analysis of the stricken conditions. Condition A.4 required current, valid prior-conduct certification to conduct postclosure care. Jersey stopped accepting waste on September 17, 1992. Pursuant to regulations pertaining to Jersey's landfill and its closure and postclosure care, the Board found subpart E of Part 807 of the Code (35 Ill. Adm. Code §§ 807.501 through 807.524 (Conway Greene CD-ROM April 1, 2001)) governed. The Board noted the IEPA did not appear to challenge that determination, and the Board reviewed the contested conditions subject to Part 807 and the Act. The Board indicated that, generally, a facility operating under Part 807 must have a "chief operator" with a prior-conduct certification under Part 745. However, according to the Board, "a facility that has a certificate of closure and is in the post[ ]closure care portion of its life, has ceased day-to-day operations." In regard to condition A.4, the Board found Part 745 of the Code's chief-operator requirement necessary to obtain prior-conduct certification was not required during postclosure care under Part 807 because the facility had ceased day-to-day operations.

## 2. *Groundwater Monitoring Requirements*

■ Condition B.6 required an analysis of parameters of all wells and an assessment of the landfill's impact on groundwater by comparing the results to the groundwater quality standard. Conditions C.1 through C.4 also dealt with groundwater monitoring requirements. Condition C.1 incorporated all of the groundwater conditions from the prior permit. Condition C.2 required Jersey to provide statistical background concentration limits to evaluate groundwater quality. Condition C.3 required Jersey to provide all sampling and analysis procedures used in providing a reliable indication of groundwater quality. Condition C.4 required Jersey to monitor gas, water, and settling along with quarterly reports to the IEPA.

Section 22.17 of the Act requires a landfill operator to monitor gas, water, and settling at the site for 15 years after the site is closed or longer as required by the Board. 415 ILCS 5/22.17(a) (West 2000). However, the Board found neither the Act nor the Board's regulations in Part 807 of the Code provide any additional specificity. The Board noted Jersey had provided a plan for monitoring groundwater, gas, and settling. Further, the groundwater monitoring results were to be evaluated against general water quality standards. The Board concluded conditions B.6 and C.1 through C.4 were unnecessary. The Board's decision striking conditions B.6 and C.1 through C.4 was not against the manifest weight of the evidence.

The IEPA also argues the Board erred in striking condition C.8, requiring, *inter alia*, water quality records to be maintained at the site operator office and reviewed quarterly during the postclosure care period. As stated earlier, the Act does require groundwater monitoring to occur. However, the Act and the Board's regulations fail to articulate the level of specificity. Jersey included a groundwater monitoring plan in its 1999 postclosure care permit application. The Board stated the plan was a condition to the permit pursuant to section 807.523 of the Code (35 Ill. Adm. Code § 807.523 (Conway Greene CD-ROM April 1, 2001)) and was sufficient to meet the requirements of the Act and the Board's regulations. Further, Jersey's postclosure period provided for recordkeeping during the postclosure care period to be maintained at the site operator's office. Based on the foregoing, we conclude the Board's decision striking condition C.8 was not against the manifest weight of the evidence.

## III. CONCLUSION

For the reasons stated, we affirm the Board's decision in Pollution

Control Board opinion No. 00—82 (June 21, 2001). With respect to Jersey's cross-appeal, we also affirm the Board's order.

Affirmed.

STEIGMANN and McCULLOUGH, JJ., concur.