Rule 23 order filed
August 3, 2017;
Motion to publish granted
September 19, 2017.

2017 IL App (5th) 160071

NO. 5-16-0071

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| D&L LANDFILL, INC., | ) | Petition for Review of an |
| | ) | Order of the Illinois |
| Petitioner, | ) | Pollution Control Board |
| | ) | |
| v. | ) | PCB No. 15-137 |
| | ) | |
| THE ILLINOIS POLLUTION CONTROL BOARD | ) | |
| and THE ILLINOIS ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, | ) | |
| | ) | |
| Respondents. | ) | |

_____

JUSTICE WELCH delivered the judgment of the court, with opinion.
Presiding Justice Moore and Justice Overstreet concurred in the judgment and opinion.

**OPINION**

¶ 1     This is an action for administrative review of a final decision and order of the respondent Illinois Pollution Control Board (Board). The petitioner, D&L Landfill, Inc. (D&L), applied to the respondent Illinois Environmental Protection Agency (IEPA) for certification that D&L had completed post-closure care of a sanitary landfill. The IEPA denied the certification because the groundwater beneath the site contained levels of contaminants that exceeded levels allowed by the Board's groundwater quality regulations. D&L appealed to the Board, and the parties filed cross-motions for summary judgment. The Board granted the IEPA's motion and denied D&L's

1

motion. On administrative review, D&L asserts that, as a matter of law, it is only required to monitor the landfill for 15 years after completing final cover; that it abated the damage to the final cover, which was the only abatable problem identified; and, in the alternative, the groundwater quality standards that it allegedly violated are not applicable to this landfill. For the following reasons, we affirm.

¶ 2     In 1967, this Greenville, Illinois, property contained a city dump regulated by the Illinois Department of Public Health. In 1970, the Illinois General Assembly passed the Illinois Environmental Protection Act (Act), which created the IEPA and the Board. 415 ILCS 5/1 *et seq.* (West 2012). Thereafter, the Board created its own solid waste landfill regulations in the Illinois Administrative Code (Code), commonly known as the part 807 regulations. 35 Ill. Adm. Code 807 *et seq*.

¶ 3     On May 13, 1974, D&L received its first IEPA permit, authorizing it to dispose of general municipal waste and a small volume of dewatered sewage sludge. The landfill operated as a "Part 807" landfill.

¶ 4     In 1990, the Board amended the landfill regulations and enacted comprehensive regulations for the development, construction, and operation of landfills. Under the new rules, existing facilities could remain open and meet the new requirements or close within a certain time frame. On August 7, 1992, D&L notified the IEPA that it intended to close, thereby avoiding the new landfill requirements.

¶ 5     On February 15, 1991, the IEPA approved D&L's initial plan to close the landfill. It issued D&L a supplemental permit with plans for the landfill's closure, post-closure care, and groundwater monitoring. The closure/post-closure plan included specifications for covering the landfill with final cover and for maintaining the site for 15 years. This plan was used to develop

2

cost estimates for the amount D&L needed to post as a performance bond, which ensured that closure and post-closure care conformed with the Act.

¶ 6    On August 10, 1992, D&L submitted a modified closure/post-closure care plan that included revised cost estimates, and the IEPA approved the modification on September 18, 1992. Over the next several years, the IEPA issued other supplemental permits dealing with closure requirements, including groundwater monitoring. On January 21, 1997, the IEPA approved closure activities at the landfill and identified August 31, 1996, as the beginning of the "15 year minimum post-closure care period" for the site.

¶ 7    On December 31, 2012, D&L filed a supplemental permit application to end post-closure care at the site. The application indicated that the 15-year post-closure care period had been completed, and it addressed landfill gas, leachate, groundwater, and stormwater management. Concerning groundwater, D&L acknowledged that analytical results for 2012's third quarter showed that some chemical levels in the groundwater exceeded naturally existing values and the values set forth in part 620 of the Board's regulations, which contains groundwater quality standards. 35 Ill. Adm. Code 620 *et seq*., amended at 36 Ill. Reg. 15206 (eff. Oct. 5, 2012). The application stated:

> "Considering the number of non-detects, the percentage of non-exceedences, the decreasing concentrations of compounds, and the low number of organic exceedances, it appears the facility is not having a negative impact on local groundwater quality. Thus, it is proposed [that the] groundwater monitoring associated with the groundwater detection monitoring system at this site be discontinued."

¶ 8    On January 18, 2013, the IEPA inspected the site. The inspection report stated that erosion, settling, ponding water, and significant ongoing leachate collection were present on the

3

site. Additionally, in February 2013, the IEPA analyzed groundwater monitoring data from wells at the site. It determined that the levels of many substances in the groundwater, including ethyl ether, tetrahydrofuran, chlorobenzene, total arsenic, total organic halogens, and dissolved boron, exceeded naturally existing values and the values set forth in part 620.

¶ 9    The IEPA sent a draft denial letter to D&L on February 26, 2013. The letter stated that D&L "[had] failed to provide proof that granting this permit would not result in violations of the [Act]." The letter stated that the IEPA inspector found several eroded and ponded areas around the landfill and that the final cover needed to be repaired. The letter also noted the many unaddressed groundwater limit exceedances.

¶ 10    On August 14, 2013, D&L submitted additional information in response to the IEPA's draft denial letter. The submittal indicated that the erosion had been corrected to the satisfaction of the IEPA inspectors. The submittal also addressed the groundwater exceedances, stating:

"The overall trend of inorganic parameter concentrations at the downgradient detection monitoring well locations is downward. A few organic parameters (TOX, chlorobenzene, ethyl ether, tetrahydrofuron) have been identified at specific well locations. The concentrations of these parameters have generally remained constant and/or have decreased over time. In some areas (e.g., chlorobenzene at G106 and tetrahydrofuron at G112) parameters are either no longer detected or the parameters are not routinely detected at the well location.

As noted in Section VII above, Class IV groundwater standards were established for this facility by the IEPA. Historical data and corresponding trend analyses suggest groundwater quality at downgradient detection monitoring well locations is generally

4

trending downward, thus constituent concentrations are below existing concentrations of constituents in groundwater."

¶ 11 On December 3, 2014, IEPA representatives met with D&L representatives to explain that D&L's submissions did not address the ongoing groundwater exceedances at the site. Thereafter, the IEPA granted several extensions of the decision deadline.

¶ 12 On December 29, 2014, the IEPA denied D&L's application for certification of completion of post-closure care. The IEPA stated in its letter that, under section 807.524 of the Board's regulations, the IEPA must certify that post-closure care has ended only if it determines "[t]hat the site will not cause future violations of the Act or this Part." 35 Ill. Adm. Code 807.524(c) (1985). The letter stated that, because of the numerous unaddressed groundwater exceedances existing at the site, the IEPA could not determine that the site would not cause future violations of Board regulations codified at sections 807.313 and 807.315 of Title 35 of the Code. Section 807.313 states that "[n]o person shall cause or allow operation of a sanitary landfill so as to cause or threaten or allow the discharge of any contamination into the environment." 35 Ill. Adm. Code 807.313 (2011). Section 807.315 states that "[n]o person shall cause or allow the development or operation of a sanitary landfill unless the applicant proves to the satisfaction of the [IEPA] that no damage or hazard will result to waters of the State because of the development and operation of the sanitary landfill." 35 Ill. Adm. Code 807.315 (2011). The letter explained that, "[d]ue to the exceedances described below, the affidavit fails to adequately demonstrate that the D&L Landfill has not impacted the groundwater. Therefore, a determination that 35 [Ill. Adm. Code] 807.313 and 807.315 will not be violated cannot be made." The IEPA listed specific exceedances that had not been addressed.

¶ 13   D&L filed a petition for review of the IEPA's decision with the Board. The IEPA and D&L filed cross-motions for summary judgment, responses to the other party's motions, and replies in support of their motions.

¶ 14   Section 22.17(a) of the Act states that "[t]he owner and operator of a sanitary landfill site *** shall monitor gas, water and settling at the completed site for a period of 15 years after the site is completed or closed, or such longer period as may be required by Board or federal regulation." 415 ILCS 5/22.17(a) (West 2012). D&L argued that this provision provides for a 15-year post-closure care period and the only way to extend the period is by Board or federal regulation. It asserted that the Board never increased the post-closure care period for part 807 landfills. D&L also alleged that sections 807.313 and 807.315 do not apply to part 807 landfills after post-closure because those regulations explicitly refer to the "operation of a sanitary landfill" and D&L is closing, not proposing to operate a sanitary landfill. D&L additionally argued that compliance with part 620 groundwater quality standards is not a condition of completing post-closure care of a part 807 landfill.

¶ 15   The IEPA argued that section 22.17(a) of the Act provides a minimum period for post-closure care and that it specifies that applying other Board regulations may result in a longer period. The IEPA asserted that applying section 807.524(c) of the Board's regulations may result in a longer post-closure care period if the IEPA cannot certify, 15 years after closure, that the facility will not cause further violations of the Act or part 807. The IEPA argued that certifying the end of D&L's post-closure care would have been inconsistent with the section 807.524(c) requirement because of the unaddressed groundwater exceedances at the site.

¶ 16   In its January 21, 2016, order, the Board granted the IEPA's motion for summary judgment, denied D&L's motion, and affirmed the IEPA's denial of a certificate of completion

of post-closure care to D&L. The Board found that, although the facility may not be "operating," the operation of the landfill during its waste-accepting years resulted in exceedances. The Board found that it is possible to violate sections 807.313 and 807.315 even if the facility has ceased accepting waste. The Board also found that section 807.524 of the Board's regulations, cited in the IEPA's denial letter, provides a two-prong test for the IEPA to use before issuing a certification: (1) that the post-closure plan has been completed and (2) that the site will not cause future violations of the Act or part 807. Based on the monitoring data, the Board agreed the prior operation of the landfill resulted in exceedances of the groundwater quality standards and, as a result, future violations of part 807 were possible.

¶ 17 The Board found that the language in section 22.17(a) of the Act was not to be read as narrowly as D&L suggested. The Board concluded that section 22.17(a), requiring the owner of a sanitary landfill site to monitor gas, water, and settling for 15 years post-closure, "or such longer period as may be required by Board or federal regulation," refers to any regulation that would require further monitoring beyond 15 years, not a single regulation. Section 807.524(c) specifically requires that the IEPA establish that the site will not cause future violations of the Act or part 807 before it may issue a certificate that post-closure care is complete, and the regulation contains no language indicating that the IEPA must issue the certificate after 15 years even if potential violations exist. The Board determined that section 22.17(a)'s 15-year post-closure period was a minimum time period.

¶ 18 The Board also concluded that the part 620 groundwater quality regulations apply to part 807 landfills. The Board noted that when it adopted the part 620 standards, it was aware of facilities that were closing under part 807, and yet nothing in part 620 provides an exemption from its standards for part 807 landfills. The Board also pointed to a prior case, *Hayden*

7

*Wrecking Corp.*, Ill. Pollution Control Bd. AS 04-03 (Jan. 6, 2005), slip op. at 1, wherein the Board specifically found that a part 807 landfill was required to demonstrate compliance with part 620 regulations. The Board affirmed the IEPA's denial of a certification of D&L's completion of post-closure care. D&L petitions for administrative review.

¶ 19    Before this court, D&L asserts that (1) as a matter of law, it is only required to monitor the landfill for 15 years after completing final cover, as the plain language of the Act requires 15 years of post-closure care unless a longer period is required by regulation, and the legislative history supports the legislature's expectation that the Board should engage in rulemaking to extend the post-closure care period beyond 15 years; (2) it abated damage to the final cover, the only abatable problem identified; and (3) alternatively, part 620 groundwater standards are not applicable to part 807 landfills.

¶ 20    The IEPA responds that (1) section 22.17(a) of the Act and section 807.524(c) of the Board's regulations require extension of a sanitary landfill's post-closure care beyond 15 years if there would otherwise be future violations of the Act or part 807 regulations, (2) sections 807.313 and 807.315 of the Board's regulations apply to D&L, and (3) part 620 groundwater regulations apply to part 807 landfills. We will address these aruguments in turn.

¶ 21    Interpretation of a statute is a question of law; in cases involving an agency's interpretation of a statute that the agency is charged with administering, the agency's interpretation is considered relevant but not binding on the court. *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995). If the language of the statute in issue is clear and unambiguous, the court must interpret the statute according to its terms without resorting to aids of construction. *Id.* The central issue raised before this court is the proper construction of section 22.17 of the Act, a question of law requiring *de novo* review. See *id.*

8

¶ 22    Section 22.17(a) of the Act states:

> "The owner and operator of a sanitary landfill site that is not a site subject to subsection (a.5) or (a.10) of this Section shall monitor gas, water and settling at the completed site for a period of 15 years after the site is completed or closed, or such longer period as may be required by Board or federal regulation." 415 ILCS 5/22.17(a) (West 2014).

¶ 23    A court should construe the Act liberally to effectuate its purposes, which are "to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." 415 ILCS 5/2(b), (c) (West 2014). Statutory provisions should be read in concert and harmonized, and, in giving meaning to the words and clauses of a statute, no part should be rendered superfluous. *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 25. In interpreting a statute, our courts presume that our legislature did not intend absurd, inconvenient, or unjust results. *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 23. The rules that govern statutory construction also apply to the construction of administrative regulations. *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 368 (2009).

¶ 24    D&L argues that no specific amendment states that post-closure care extends beyond 15 years. In support of its argument, D&L points to regulations that have specifically extended the post-closure care period for new landfills that remained open past 1994.[1] It also notes that

---

[1]D&L cites section 258.61(a) of Title 40 of the Code of Federal Regulations, which states that "[p]ost-closure care must be conducted for 30 years" (40 C.F.R. § 258.61(a) (2013)), and section 811.319(a)(1)(A) of Title 35 of the Code, which requires groundwater monitoring "for a minimum period

9

section 807.318(a) of the Board's regulations (stating that a sanitary landfill owner "shall monitor gas, water, and settling at the completed site for a period of three years after the site is completed or closed" (35 Ill. Adm. Code 807.318(a) (2007))), while superseded by section 22.17(a), demonstrates that "the General Assembly understood what a specific regulatory period looked like since it incorporated the Board's existing regulatory language," and later statutory changes to the time period are rendered meaningless if the IEPA always had the independent authority to extend post-closure care beyond the specified term.

¶ 25    The Board maintains that the post-closure care period can be extended by Board regulations that do not specifically create an extended period, so long as future violations may occur. It points to the language of section 22.17(a), which explicitly provides that there are circumstances under which the post-closure care of a sanitary landfill may last longer than 15 years with the proviso "or such longer period as may be required by [the] Board or federal regulation." Thus, if a Board regulation requires monitoring for a period longer than 15 years, then section 22.17(a) does as well.

¶ 26    The IEPA points to section 807.524(c) as the Board regulation that allows for extension of D&L's post-closure care timeline. It states:

    "(c) The Agency shall certify that the post-closure care had ended when it

    determines:

        (1) That the post-closure care plan has been completed; and,

---

of 15 years after closure, or in the case of [municipal solid waste landfill] units, a minimum period of 30 years after closure." 35 Ill. Adm. Code 811.319(a)(1)(A) (2013).

10

(2) That the site will not cause future violations of the Act or this Part." 35 Ill. Adm. Code 807.524(c) (1985).

¶ 27    The IEPA argues that this regulation contains no exceptions; it is prohibited from certifying that D&L's post-closure care had ended unless it determines that the site will not cause future violations of the Act or part 807. The IEPA also points out that this result is consistent with section 39(a) of the Act, which requires the IEPA to issue a permit only "upon proof by the applicant that the facility *** will not cause a violation of this Act or of regulations hereunder." 415 ILCS 5/39(a) (West 2014).

¶ 28    We conclude that D&L's interpretation is inconsistent with the Act's purposes and fails to harmonize the statutory provisions relating to post-closure care. D&L construes section 22.17(a)'s "or such longer period as may be required by Board or federal regulation" narrowly, to mean a particular regulation that specifically amends the minimum years required for post-closure care. This construction ignores the related Board and federal regulations that would come into conflict with this reading of section 22.17(a) if a landfill were to threaten the environment even after 15 years of post-closure care. D&L's interpretation results in the 15-year period being a maximum, but this reading results in section 22.17(a) superseding, rather than harmonizing with, the Board's part 807 regulations.

¶ 29    Section 807.524(c) explicitly prohibits the IEPA from granting certification for post-closure care to a facility if it determines that future violations of the Act are possible. As we are to interpret statutory provisions to give every section meaning and to avoid illogical results, we find section 22.17(a)'s qualifier "or such longer period as may be required by Board or federal regulation" anticipates that environmental impact issues may arise during the post-closure care period that must be addressed by the landfill and therefore allows for a longer post-closure care

11

period in those circumstances. Construing the Act liberally to effectuate its purposes, we decline to interpret section 22.17(a) as narrowly as D&L suggests.

¶ 30    Before addressing D&L's next argument, we confirm that sections 807.313 and 807.315 of the Board's regulations apply to D&L.[2] Though these sections refer to operation and development, in its order, the Board found that, even though D&L was not "operating," its operation during its waste-accepting years resulted in groundwater exceedances. The Board found it is possible to violate sections 807.313 and 807.315, even if the facility has ceased accepting waste. We agree with this interpretation.

¶ 31    D&L next asserts that it abated damage to the final cover, which was the only abatable problem identified. However, the IEPA's denial letter stated that, because of the numerous unaddressed groundwater exceedances existing at the site, pursuant to section 807.524(c), the IEPA could not determine that the site would not cause future violations of Board regulations codified at sections 807.313 and 807.315 of the Board's regulations. Thus, the IEPA ordered continued groundwater monitoring. D&L asserts that "there was no abatement directed because there was nothing to do," as the trend of groundwater quality had been improving over time. We disagree with this assessment, as the IEPA has the authority, pursuant to section 22.17(a) of the Act and section 807.524(c) of the Board's regulations, to determine that D&L was required to

---

[2]For clarity, we will repeat the regulations here. Section 807.313 states that "[n]o person shall cause or allow operation of a sanitary landfill so as to cause or threaten or allow the discharge of any contamination into the environment." 35 Ill. Adm. Code 807.313 (2011). Section 807.315 states that "[n]o person shall cause or allow the development or operation of a sanitary landfill unless the applicant proves to the satisfaction of the [IEPA] that no damage or hazard will result to waters of the State because of the development and operation of the sanitary landfill." 35 Ill. Adm. Code 807.315 (2011).

12

monitor groundwater exceedances until they reach the acceptable levels as determined by the Board's regulations. Thus, the groundwater exceedances were a problem identified by the IEPA, and the IEPA's denial of certification of post-closure care for this reason was consistent with section 22.17(a) of the Act and section 807.524 of the Board's regulations.

¶ 32　Finally, D&L maintains that the part 620 groundwater standards are not applicable to part 807 landfills. However, we find that the Board correctly concluded that the part 620 standards may be properly applied to a part 807 landfill.

¶ 33　First, we note that there is no language in part 620 exempting sanitary landfills from its groundwater standards, and a court should not read into a statute exceptions or conditions not expressed by the authors. *People ex rel. Glasgow v. Carlson*, 2016 IL 120544, ¶ 17. Section 620.401 states that "[g]roundwaters must meet the standards appropriate to the groundwater's class as specified in this Subpart and the nondegradation provisions of Subpart C." 35 Ill. Adm. Code 620.401 (2012). Section 620.201 contains the designations of the groundwaters of the State:

"All groundwaters of the State are designated as:

(a) One of the following four classes of groundwater in accordance with Sections 620.210 through 620.240:

(1) Class I: Potable Resource Groundwater;

(2) Class II: General Resource Groundwater;

(3) Class III: Special Resource Groundwater;

(4) Class IV: Other Groundwater;

(b) A groundwater management zone in accordance with Section 620.250; or

13

(c) A groundwater management zone as defined in 35 Ill. Adm. Code 740.120 and established under 35 Ill. Adm. Code 740.350." 35 Ill. Adm. Code 620.201 (1997).

¶ 34    D&L's groundwater is classified as Class IV groundwater, and it is undisputed that the levels of many chemicals at the landfill site exceeded the values set forth in part 620 of the Board's regulations. Indeed, in D&L's December 31, 2012, application to end post-closure care, it acknowledged that, in determining if a significant change in groundwater quality occurred, the values for each well were evaluated against "[t]he applicable groundwater quality standards as listed in Subpart D of 35 [Ill. Adm. Code], Part 620." D&L stated that "[a]s noted within 35 [Ill. Adm. Code] 620.240, groundwater within a zone of attenuation is considered Class IV groundwater. Therefore, Part 620 values for Class IV groundwater were utilized to assess groundwater conditions at the site."

¶ 35    In support of its position, D&L relies on *Environmental Protection Agency v. Jersey Sanitation Corp.*, 336 Ill. App. 3d 582 (2003). In *Jersey Sanitation*, the IEPA approved a 1993 landfill closure plan for Jersey Sanitation Corporation (Jersey). *Id.* at 584. In 1999, Jersey sought a supplemental permit for a certificate of closure, and the IEPA granted the supplemental permit with conditions. *Id.* Jersey filed a petition for review of the permit conditions with the Board and later filed a motion for summary judgment, arguing that the conditions were unnecessary to meet the requirements of part 807 or the Act. *Id.* The challenged conditions included specific requirements for groundwater monitoring during post-closure care. *Id.* The Board granted Jersey's motion in *Jersey Sanitation Corp.*, Ill. Pollution Control Bd. Op. 00-82 (June 21, 2001) (*Jersey Sanitation I*). The appellate court affirmed the Board's finding that neither the Act nor part 807 specifically requires any particular standard beyond section 22.17(a) of the Act (requiring a landfill operator to monitor gas, water, and settling at the site for 15 years after the

14

site is closed or longer as required by the Board). *Jersey Sanitation*, 336 Ill. App. 3d at 594. The Board noted that Jersey had provided a plan for monitoring the groundwater, which was to be evaluated against general water quality standards. *Id.* The Board concluded that the conditions were unnecessary, and the appellate court found that this determination was not against the manifest weight of the evidence. *Id.*

¶ 36    D&L asserts that *Jersey Sanitation* concludes that "had Part 807 landfills been required to meet Part 620 groundwater quality standards, the landfill would have been required to monitor pursuant to that standard," and that "[n]either the Act, nor the Board's regulations, were found to require Part 807 landfills to assess groundwater quality based upon Part 620 standards."

¶ 37    However, the Board in the case before us found that the *Jersey Sanitation I* Board's finding was not so comprehensive, pointing out that, although the Board struck the groundwater monitoring conditions in the appeal of Jersey's post-closure care permit, it did so because Jersey's post-closure plan included groundwater monitoring; the landfill was therefore required to monitor groundwater and report the findings. The *Jersey Sanitation I* Board found that comparing parameters to the general water quality standards was sufficient in that case, and thus, the imposition of additional conditions was unnecessary to meet the Act's requirements and the Board's regulations. See *Jersey Sanitation I*, Op. 00-82, at 13.

¶ 38    For the same reasons, we agree with the Board that D&L's reading of this case is overly broad. Additionally, the IEPA correctly points out that the Board, in a subsequent enforcement case against Jersey, concluded that Jersey's part 807 landfill did violate part 620 groundwater regulations and therefore violated sections 807.313 and 807.315 of the Board's regulations. *Jersey Sanitation Corp.*, Ill. Pollution Control Bd. Op. 97-2, at 16-22 (Feb. 3, 2005) (*Jersey Sanitation II*). D&L argues that *Jersey Sanitation I* is more applicable than *Jersey Sanitation II*

15

because the former is a permit appeal and the latter is an enforcement action, which are different proceedings with different burdens of proof. However, in reading the cases together, it appears that the Board intended that groundwater monitoring be a requirement of the permit and that, if exceedances of groundwater quality standards occurred, it was a violation of the Act. Therefore, the unaddressed groundwater exceedances in this case provided a sufficient basis for the IEPA's denial of post-closure certification and the Board's affirmation of that decision.

¶ 39 For the foregoing reasons, we affirm the Board's decision upholding the IEPA's denial of D&L's post-closure care certification.

¶ 40 Affirmed.

16

2017 IL App (5th) 160071

NO. 5-16-0071

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| D&L LANDFILL, INC., | ) | Petition for Review of an |
| | ) | Order of the Illinois |
| Petitioner, | ) | Pollution Control Board |
| | ) | |
| v. | ) | PCB No. 15-137 |
| | ) | |
| THE ILLINOIS POLLUTION CONTROL BOARD | ) | |
| and THE ILLINOIS ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, | ) | |
| | ) | |
| Respondents. | ) | |

_____

**Rule 23 Order Filed:**        August 3, 2017
**Motion to Publish Granted:**        September 19, 2017
**Opinion Filed:**        September 19, 2017

_____

**Justices:**        Honorable Thomas M. Welch, J.

        Honorable James R. Moore, P.J., and
        Honorable David K. Overstreet, J.,
        Concur

_____

**Attorney**        Patrick D. Shaw
**for**        80 Bellerive Road
**Appellant**        Springfield, IL 62704

_____

**Attorneys**        Lisa Madigan, Attorney General, State of Illinois, David L. Franklin, Solicitor
**for**        General, John P. Schmidt, Assistant Attorney General, Christopher M.R. Turner,
**Appellees**        Assistant Attorney General, 100 West Randolph Street, 12th Floor, Chicago, IL
        60601; Illinois Pollution Control Board, 100 W. Randolph Street, Suite 11-500,
        Chicago, IL 60601

_____